518 So.2d 304 (1987)
Sherman HUNTER, Appellant,
v.
STATE of Florida, Appellee.
No. 4-86-1312.
District Court of Appeal of Florida, Fourth District.
November 12, 1987.
On Petition for Rehearing January 20, 1988.
Rehearing Denied February 12, 1988.
*305 Kayo E. Morgan and Fred Haddad of Sandstrom & Haddad, Fort Lauderdale, for appellant.
Robert A. Butterworth, Jr., Atty.Gen., Tallahassee, and Deborah Guller, Asst. Atty. Gen., West Palm Beach, for appellee.
ANSTEAD, Judge.
This is an appeal challenging the trial court's order denying a motion to suppress evidence seized from the appellant while he was a passenger on an interstate bus temporarily stopped at a bus station in Broward County. We affirm because we find clear and convincing evidence to sustain the trial court's finding that appellant's consent to search was freely and voluntarily given.
This case presents only a slight factual variation of State v. Carroll, 510 So.2d 1133 (Fla. 4th DCA 1987), in which this court approved a trial court's order suppressing the results of an alleged consent search. The trial court there, unlike the court here, found that the alleged consent was not freely and voluntarily given, but rather was the result of the inherently coercive nature of the confrontation of the passenger by the police. Here, the law enforcement officers boarded a bus that was ready to depart, and went through the bus, asking each passenger if he or she would consent to a search of their baggage. A critical distinction in the evidence here was appellant's testimony that he had observed other passengers refuse to consent to a search before he was approached. That evidence supports the trial court's holding.
Factually, there is nothing in United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), the sole case upon which the state relies, to support this inquiry of every passenger who has boarded a bus or airplane, train or boat  none of which have actually departed their gate, station or berth. In Mendenhall the events took place on a public concourse. The Supreme Court there took great pains to point out that the respondent could terminate the conversation and go about her business. That, to us, is a far cry from leaving the bus, airplane, train or boat. We find the confrontation of each passenger on a bus in transit more appropriate to totalitarian countries than to our own. See State v. Kerwick, 512 So.2d 347 (Fla. 4th DCA 1987).
Nevertheless, the law is clear that, notwithstanding the above apparently common practice of the law enforcement officers, if there were clear and convincing proof of an unequivocal break in the chain of illegality sufficient to dissipate the taint, consent to the subsequent search of his baggage will be held voluntary and the evidence not to have been illegally seized. See Norman v. State, 379 So.2d 643 (Fla. 1980). In conclusion we emphasize the responsibility of the trial court to determine that any alleged consent search was given freely and voluntarily and not just in response to apparent police authority. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); State v. Kerwick, supra.
We find no error as to appellant's remaining point, and accordingly affirm.
GOLDMAN, MURRAY, Associate Judges, concur.
GLICKSTEIN, J., concurs specially with opinion.
GLICKSTEIN, Judge, concurring specially.
When this case was orally argued, Judge Goldman and I were very much concerned about the conduct of the law enforcement officers in approaching passengers at random on board a bus. Because of my concerns, I was asked by the panel to write an opinion.
On March 27, 1987, I circulated the following opinion which was to be issued on April 22, 1987, and which continues to represent my views:
This is an inevitable factual extension of Snider v. State, 11 F.L.W. 964 [501 So.2d 609] (Fla. 4th DCA Apr. 23, 1986), in which this writer dissented. There, as recited in the dissent, an individual passenger on a bus about ready to depart *306 was approached by law enforcement officers with the request that he consent to a search of whatever baggage he may have.
Here, the law enforcement officers boarded a bus that was ready to depart, and went through the bus, asking each passenger if he or she would consent to a search of their baggage.
The last paragraph of the dissent in Snider recites:
Occasionally the price we must pay to make innocent persons secure from unreasonable search and seizure of their persons or property is to let an offender go. Those who suffered harassment from King George III's forces would say that is not a great price to pay. So would residents of the numerous totalitarian and authoritarian states of our day.
What the writer feared could happen has happened in this case. We find this inquiry of each passenger more appropriate to totalitarian countries than to our own. Accordingly, we deplore it.
Factually, there is nothing in United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), the sole case upon which the state relies, to support this inquiry of every passenger who has boarded a bus or airplane, train or boat  none of which have actually departed their gate, station or berth. In Mendenhall the events took place on a public concourse. The Supreme Court there took great pains to point out that the respondent could terminate the conversation and go about her business. That, to us, is a far cry from leaving the bus, airplane, train or boat.
Nevertheless, the law is clear that, notwithstanding the above apparently common practice of the law enforcement officers, if there was clear and convincing proof of an unequivocal break in the chain of illegality sufficient to dissipate the taint, consent to the subsequent search of his baggage will be held voluntary and the evidence not to have been illegally seized. See Norman v. State, 379 So.2d 643 (Fla. 1980). We remind the reader of the five point test in Schneckloth v. Bustamonte, 412 U.S. 216 [218], 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973):
1. Was there any coercion, either express or implied?
2. Was the capacity of the consenting individual limited in any way?
3. Was the individual advised of the right to refuse to consent to the search?
4. Did the police threaten to obtain a search warrant?
5. Was the individual's conduct and/or statement consistent with a valid consent to the search?
The trial court believed the testimony of the two law enforcement officers involved here that appellant gave his permission to the search. In Snider, it was one against one.
We find no error as to appellant's remaining point, and affirm.
Questions posed by some of the judges on the court occasioned the opinion's being pulled by Judge Anstead, who then prepared the opinion which reflects his views. I do not share his perception of the "distinction" in the conduct of the officers which he draws from Carroll.
Since March, 1987, other judges in the court have come to express concerns about the conduct of law enforcement officers in these transportation cases involving drugs, which conduct previously met with the approval of the majority in Snider and by the panel in Rodriguez v. State, 494 So.2d 496 (Fla. 4th DCA 1986). Who knows how many PCA's also approved such conduct!
I wish to make several pertinent observations. First, I suggest that justice is often a matter of perception; and appellate law often simply an expression of the value systems of those that pronounce it.
Second, in 1982, by constitutional amendment to article I, section 12, we Floridians unfortunately eliminated our state courts' right to consider search and seizure questions under our state constitution's Declaration of Rights without being bound by federal court decisions on an issue decided under the fourth amendment of the federal constitution.
*307 Third, drug use and sale are creating havoc with our law enforcement and judicial systems. Nevertheless, we Floridians must be self-accountable for our own individual decision making. Judicial decisions which violate individual rights in order to "get tough on drugs" are neither an answer to individual responsibility nor a democratic method of dealing with individual rights. A responsible legislature would fund preventive programs, and a responsible society would do whatever it can and should to educate; but the buck stops with the individual.

ON PETITION FOR REHEARING
PER CURIAM.
We deny appellant's petition for rehearing.
ANSTEAD, J., and GOLDMAN, MURRAY, Associate Judges, concur.
GLICKSTEIN, J., concurs specially with opinion.
GLICKSTEIN, Judge, concurring specially.
While the state has added to our burden by failing to file a response to appellant's petition for rehearing, appellant has cited a case in support of his position which somewhat buttresses rather than weakens our decision. Yet I am not completely comfortable with the affirmance, any more than I was at the time of the original opinion.
In State v. Gribeiro, 513 So.2d 1323, 1324 (Fla.3d DCA 1987), the Third District Court of Appeal reversed an order of suppression and said:
The state appeals from an order suppressing a large quantity of cocaine and an incriminating statement secured after a police stop of the defendant's vehicle which the trial judge held was not founded upon an articulable suspicion of wrongdoing. We need not and do not consider the correctness of this conclusion that the stop was constitutionally invalid, because the lower court also determined, based upon ample record evidence, that
[o]nce the defendant was stopped, there is no question ... that the defendant was seized within the meaning of the Fourth Amendment, that he was advised of his rights pursuant to the "Miranda rule", that he was advised that he need not consent to a search, and, in spite of these events, he voluntarily consented to a search which disclosed the existence of several kilos of cocaine and voluntarily made an inculpatory statement. [e.s.]
Many Florida cases, beginning with Husted v. State, 370 So.2d 853 (Fla.3d DCA 1979), have clearly established that any taint which may arise from even an unlawful prior seizure of the defendant's person is dissipated as a matter of law when he is advised of his constitutional right to refuse consent to search and nevertheless voluntarily does so. State v. Martinez, 459 So.2d 1062 (Fla.3d DCA 1984); State v. Milwood, 430 So.2d 563 (Fla.3d DCA 1983); State v. Howard, 394 So.2d 440 (Fla.3d DCA 1981); State v. Henry, 390 So.2d 92 (Fla.3d DCA 1980); State v. Champion, 383 So.2d 984 (Fla. 4th DCA 1980); see also United States v. Watson, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976).
State v. Champion, 383 So.2d 984 (Fla. 4th DCA 1980), did not involve the stop of an "on board" passenger; the search took place in an airport. The opinion recited:
The actual evidence was simply that two police officers approached defendant and identified themselves. They told the defendant they were involved in an investigation of drug trafficking and explained that their job was based only on general public cooperation. They explained that the defendant would have to consent to the search before it would be performed and that he did not have to give his consent. The testimony was that the defendant readily and spontaneously consented to the request to search by the officers. Both officers stated defendant was free to go at any time.
The court held the state met its burden of proving the defendant's consent by introducing clear and convincing evidence.
*308 In the present case, a detective with the sheriff's organized crime unit testified at trial as follows:
Q. You asked him if you could search his bag?
A. I asked him for permission to search his bag for drugs.
Q. All right. And you told him, did you not, that he had a right to refuse that search?
A. I did.
Q. And conveying to him then that he had the option to tell you that you could not search that bag; correct?
A. I told him that, yes.
Q. Okay. And that would have meant either you didn't search or you had to go take the bag or something else; right?
A. No.
Q. Or you just would let him go?
A. We would have let him go if I did not see the drugs.
Q. Okay. But I'm saying if he had told you I don't want you to search my bag, you would have had to let him go?
A. That's true.
Q. And you were talking, were you not, in the tone of voice that we're using now?
A. Yes, I was.
Q. And you weren't trying to convey any threats to  or anything to him?
A. That's true.
Q. Okay. So in a normal conversational tone you're talking to the jury, you told him you're looking for drugs but he had a right to refuse you to allow you to search?
A. Yes, I did.
Another employee of the sheriff's office, assigned to the same unit at the time, testified in a limited fashion at trial, saying:
Q. Without saying anything that Mr. Nutt said, just what did you see Mr. Hunter do?
A. Mr. Hunter picked up the bag that was on the window seat that he had his arm around, put his  It on his lap. He unzipped the bag and proceeded to shuffle through the contents of the bag.
Q. Did you see Mr. Hunter pick the bag up and hand the bag to Mr. Nutt and say, here, you can search the bag?
A. He picked the bag up and gave Mr.  Detective Nutt permission to search the bag. He rested it on his lap there.
Q. Did he give the bag to Mr. Hunter? And did Mr. Hunter give Mr. Nutt the bag so he could do whatever he wanted to with the whole bag?
A. Yes, he did. Yes, he did.
Her testimony at the hearing on the motion to suppress was almost as equally limited. She said:
THE COURT: Tell what was said and what happened?
THE WITNESS: All right. Detective Nutt asked for his permission to look in the bag. And the Defendant agreed to have him look in the back [sic].
MR. HADDAD: No, I object.
THE COURT: What did he say?
THE WITNESS: I don't recall specifically.
THE COURT: He agreed? He said no?
THE WITNESS: Okay. Yes. Whatever. He gave him permission.
MR. HADDAD: Now I object because 
THE COURT: Hold it. You don't have to object. Just tell me what was said. If there was nothing said, I want to know that too.
THE WITNESS: He did state that you could look in the bag. I don't recall specifically, not word for word, what he said. He gave him verbal consent to look in the bag.
When one cuts through the nonessential matter, I perceive this case as but a shade different from Snider v. State, 501 So.2d 609 (Fla. 4th DCA 1986). Not only is the state's primary witness the same in both cases, his testimony is very similar. Here, as there, the defendant contradicted the detective's version of the facts in critical areas, including verbal consent. The only real difference in the two cases is the pale corroboration here of the second employee of the sheriff's office. The primary witness *309 testified that he informed the defendant that he could refuse to consent, which is the heart of State v. Gribeiro. The defendant denied it. The other officer's testimony is above. Thus my discomfort, given the constitutionally infirm stop, albeit the proof of some of the litmus tests in Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).
Hopefully, the legislature will require recordings of these stops in the future. See the discussion of Stephan v. State, 711 P.2d 1156 (Alaska 1985), in the writer's opinion in Smith v. State, 514 So.2d 367 (Fla. 4th DCA 1987).