512 So.2d 347 (1987)
STATE of Florida, Appellant,
v.
Carol Ann KERWICK, Appellee.
No. 87-0651.
District Court of Appeal of Florida, Fourth District.
September 16, 1987.
Robert A. Butterworth, Jr., Atty. Gen., Tallahassee, and Diane E. Leeds, Asst. Atty. Gen., West Palm Beach, for appellant.
J. David Bogenschutz and John Patrick Contini of Kay and Bogenschutz, P.A., Fort Lauderdale, for appellee.
ANSTEAD, Judge.
This is an appeal from an order of the trial court suppressing evidence seized from the appellee, Carol Ann Kerwick, in the parking lot of the train station in Fort Lauderdale. The trial court set out its reasoning in detailed findings of fact and conclusions of law that explain the case in a fashion upon which we do not feel we can improve:
"FINDINGS OF FACT:
"That the Defendant was approached by officers of the Broward Sheriff's Office at the Amtrak Station in Fort Lauderdale, Florida, while she was seated in the passenger seat of a vehicle driven by one Sean Brasky. That defendant was doing nothing *348 illegal, nor was she acting suspiciously. Officers Damiano and Bukata stood at each front door, flanking the automobile, impeding the opening of the driver and passenger doors. The officers identified themselves with badges, and identification cards. They requested identification, tickets and an explanation of who was traveling, and where. Nothing was determined to be amiss.
"Officer Damiano then asked the Defendant if he could `check' her luggage. The Defendant legitimately felt as though she could not leave. She agreed to permit the officer to `check' the baggage.
"Upon hand checking the large suitcase, the officer found a smaller bag therein, which was locked. No request was made by the officer to unlock or open the smaller bag. Defendant testified that if they had requested the right to cut into the luggage, she would have refused. The officer then cut the bag open and pulled from the package a small amount of substance later tested to be cocaine.
"Defendant was then arrested, and read her Miranda rights. She refused to speak with the officers without an attorney present. (It should be noted that even if the Court totally believed the officer, no waiver was ever shown).
"The Defendant was taken, in custody, to the Broward Sheriff's Office substation and a further examination of the baggage took place in her presence. A pair of sunglasses was found at which time she was asked if they were hers. She answered `Yes they are  do you need them for evidence?' Additionally, several articles of what are commonly known as drug paraphernalia were found inside the smaller bag with the sunglasses. At the time of the inquiry regarding the sunglasses, Miranda was still not waived, and right to counsel had been invoked. No additional rights were read, nor was the rights waiver form (provided later to this Defendant) executed by the Defendant  it was refused.
"Now, after consideration, the Court makes the following
"RULINGS OF LAW:
"1. As to the issue of the admissibility of statements of the Defendant relating to the sunglasses, the Motion to Suppress is GRANTED. The State has failed to show a knowing and voluntary waiver of Miranda, and the Court frankly believes that the Defendant invoked her right to counsel;
"2. As to the issue of the admissibility of any seizures made from the luggage of the Defendant, or from the smaller bag found therein, the Motion to Suppress is GRANTED. The Court rules that any `consent' amounted to a permission to `check' the baggage and was clearly limited to that. It did not extend to the type of physical violation and destruction of personal property of a `cooperative' individual that was demonstrated by testimony. The Court has no doubt, that any citizen would object to the type of action taken by the officers in this case, and finds such activity a search and seizure which is, at best, `unreasonable', and, at worst, a flagrant denial of this Defendant's First and Fourth Amendment rights. There exists an original `taint' in that seizure that is not attenuated, but exacerbated by the subsequent actions of the officers. The State has failed to show voluntary consent to their required burden of `clear and convincing evidence'.
"Even if the Rulings of Law made herein were not amply supported by the evidence, the Court would find extremely troublesome the admitted policies of these Broward deputies regarding `encounters' with the public. Despite the apparent protections of Article One, Section 23 of the Florida Constitution, commonly referred to as a `right of privacy', the evidence in this cause has evoked images of other days, under other flags, when no man traveled his nation's roads or railways without fear of unwarranted interruption, by individuals who held temporary power in the Government. The spectre of American citizens being asked, by badge-wielding police, for identification, travel papers  in short a raison d'etre  is foreign to any fair reading of the Constitution, and its guarantee of human liberties. This is not Hitler's Berlin, nor Stalin's Moscow, nor is it white supremacist South Africa. Yet in Broward *349 County, Florida, these police officers approach every person on board buses and trains (`that time permits') and check identification, tickets, ask to search luggage  all in the name of `voluntary cooperation' with law enforcement  to the shocking extent that just one officer, Damiano, admitted that during the previous nine months, he, himself, had searched in excess of three thousand bags! In the Court's opinion, the founders of the Republic would be thunderstruck. It certainly shocks the Court's conscience that the American public would be `asked', at badge-point, without the slightest suspicion, to interrupt their schedules, travels and individual liberties to permit such intrusions. This Court would ill-expect any citizen to reject, or refuse, to cooperate when faced with the trappings of power like badges and identification cards. And these officers know that  that is one reason that they display those trappings. It is much like the feeling that an ordinary citizen has on seeing a patrol car behind him, or observing blue lights flashing, or being confronted by a police officer asking questions.
"In all of this, however, it is the court which must separate the acceptable from the non-acceptable, the reasonable from the unreasonable. The facts and evidence presented have compelled the Rulings of Law which followed.
"As to the matters peripheral, the Court adopts the rationale, and philosophy, of Justice Brandeis, whose words, in Olmstead v. United States shine as brightly today as they did years ago and remind us mellifluently of the penumbra privilege of American citizenship:
`The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the government, the right to be let alone  the most comprehensive of rights and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment. And the use, as evidence in a criminal proceeding, of facts ascertained by such intrusion must be deemed a violation of the Fifth.'"
Olmstead v. United States, 277 U.S. 438, 478, 479, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928).
We affirm.
DELL and WALDEN, JJ., concur.