# FLORIDA *v.* BOSTICK

No. 89–1717.   Argued February 26, 1991—Decided June 20, 1991

*Joan Fowler*, Assistant Attorney General of Florida, argued the cause for petitioner.   With her on the brief was *Robert A. Butterworth*, Attorney General.

*Solicitor General Starr* argued the cause for the United States as *amicus curiae* urging reversal.   With him on the brief were *Assistant Attorney General Mueller, Deputy Solicitor General Bryson, Christopher J. Wright*, and *Kathleen A. Felton*.

*Donald B. Ayer* argued the cause for respondent.   With him on the brief was *Robert H. Klonoff*.*

---

*\*Mary Irene Coombs, Steven R. Shapiro, John A. Powell, James K. Green, Jeffrey S. Weiner*, and *Robert G. Amsel* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance.

*Fred E. Inbau, Wayne W. Schmidt, Bernard J. Farber*, and *James P. Manak* filed a brief for Americans for Effective Law Enforcement as *amicus curiae*.

JUSTICE O'CONNOR delivered the opinion of the Court.

We have held that the Fourth Amendment permits police officers to approach individuals at random in airport lobbies and other public places to ask them questions and to request consent to search their luggage, so long as a reasonable person would understand that he or she could refuse to cooperate. This case requires us to determine whether the same rule applies to police encounters that take place on a bus.

I

Drug interdiction efforts have led to the use of police surveillance at airports, train stations, and bus depots. Law enforcement officers stationed at such locations routinely approach individuals, either randomly or because they suspect in some vague way that the individuals may be engaged in criminal activity, and ask them potentially incriminating questions. Broward County has adopted such a program. County Sheriff's Department officers routinely board buses at scheduled stops and ask passengers for permission to search their luggage.

In this case, two officers discovered cocaine when they searched a suitcase belonging to Terrance Bostick. The underlying facts of the search are in dispute, but the Florida Supreme Court, whose decision we review here, stated explicitly the factual premise for its decision:

> " 'Two officers, complete with badges, insignia and one of them holding a recognizable zipper pouch, containing a pistol, boarded a bus bound from Miami to Atlanta during a stopover in Fort Lauderdale. Eyeing the passengers, the officers, admittedly without articulable suspicion, picked out the defendant passenger and asked to inspect his ticket and identification. The ticket, from Miami to Atlanta, matched the defendant's identification and both were immediately returned to him as unremarkable. However, the two police officers persisted and explained their presence as narcotics agents on the

lookout for illegal drugs. In pursuit of that aim, they then requested the defendant's consent to search his luggage. Needless to say, there is a conflict in the evidence about whether the defendant consented to the search of the second bag in which the contraband was found and as to whether he was informed of his right to refuse consent. However, any conflict must be resolved in favor of the state, it being a question of fact decided by the trial judge.'" 554 So. 2d 1153, 1154–1155 (1989), quoting 510 So. 2d 321, 322 (Fla. App. 1987) (Letts, J., dissenting in part).

Two facts are particularly worth noting. First, the police specifically advised Bostick that he had the right to refuse consent. Bostick appears to have disputed the point, but, as the Florida Supreme Court noted explicitly, the trial court resolved this evidentiary conflict in the State's favor. Second, at no time did the officers threaten Bostick with a gun. The Florida Supreme Court indicated that one officer carried a zipper pouch containing a pistol—the equivalent of carrying a gun in a holster—but the court did not suggest that the gun was ever removed from its pouch, pointed at Bostick, or otherwise used in a threatening manner. The dissent's characterization of the officers as "gun-wielding inquisitor[s]," *post*, at 448, is colorful, but lacks any basis in fact.

Bostick was arrested and charged with trafficking in cocaine. He moved to suppress the cocaine on the grounds that it had been seized in violation of his Fourth Amendment rights. The trial court denied the motion but made no factual findings. Bostick subsequently entered a plea of guilty, but reserved the right to appeal the denial of the motion to suppress.

The Florida District Court of Appeal affirmed, but considered the issue sufficiently important that it certified a question to the Florida Supreme Court. 510 So. 2d, at 322. The

Supreme Court reasoned that Bostick had been seized because a reasonable passenger in his situation would not have felt free to leave the bus to avoid questioning by the police. 554 So. 2d, at 1154. It rephrased and answered the certified question so as to make the bus setting dispositive in every case. It ruled categorically that "'an impermissible seizure result[s] when police mount a drug search on buses during scheduled stops and question boarded passengers without articulable reasons for doing so, thereby obtaining consent to search the passengers' luggage.'" *Ibid.* The Florida Supreme Court thus adopted a *per se* rule that the Broward County Sheriff's practice of "working the buses" is unconstitutional.* The result of this decision is that police in Florida, as elsewhere, may approach persons at random in most public places, ask them questions and seek consent to a search, see *id.*, at 1156; but they may not engage in the same behavior on a bus. *Id.*, at 1157. We granted certiorari, 498 U. S. 894 (1990), to determine whether the Florida Supreme Court's *per se* rule is consistent with our Fourth Amendment jurisprudence.

## II

The sole issue presented for our review is whether a police encounter on a bus of the type described above necessarily constitutes a "seizure" within the meaning of the Fourth Amendment. The State concedes, and we accept for purposes of this decision, that the officers lacked the reasonable

---

*The dissent acknowledges that the Florida Supreme Court's answer to the certified question reads like a *per se* rule, but dismisses as "implausible" the notion that the court would actually apply this rule to "trump" a careful analysis of all the relevant facts. *Post*, at 445. Implausible as it may seem, that is precisely what the Florida Supreme Court does. It routinely grants review in bus search cases and quashes denials of motions to suppress *expressly on the basis of its answer to the certified question in this case.* See, *e. g.*, *McBride* v. *State*, 554 So. 2d 1160 (1989); *Mendez* v. *State*, 554 So. 2d 1161 (1989); *Shaw* v. *State*, 555 So. 2d 351 (1989); *Avery* v. *State*, 555 So. 2d 351 (1989); *Serpa* v. *State*, 555 So. 2d 1210 (1989); *Jones* v. *State*, 559 So. 2d 1096 (1990).

suspicion required to justify a seizure and that, if a seizure took place, the drugs found in Bostick's suitcase must be suppressed as tainted fruit.

Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free "to disregard the police and go about his business," *California* v. *Hodari D.*, 499 U. S. 621, 628 (1991), the encounter is consensual and no reasonable suspicion is required. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature. The Court made precisely this point in *Terry* v. *Ohio*, 392 U. S. 1, 19, n. 16 (1968): "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."

Since *Terry*, we have held repeatedly that mere police questioning does not constitute a seizure. In *Florida* v. *Royer*, 460 U. S. 491 (1983) (plurality opinion), for example, we explained that "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." *Id.*, at 497; see *id.*, at 523, n. 3 (REHNQUIST, J., dissenting).

There is no doubt that if this same encounter had taken place before Bostick boarded the bus or in the lobby of the bus terminal, it would not rise to the level of a seizure. The Court has dealt with similar encounters in airports and has found them to be "the sort of consensual encounter[s] that implicat[e] no Fourth Amendment interest." *Florida* v. *Rodriguez*, 469 U. S. 1, 5–6 (1984). We have stated that even

when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, see *INS* v. *Delgado*, 466 U. S. 210, 216 (1984); *Rodriguez, supra*, at 5–6; ask to examine the individual's identification, see *Delgado, supra*, at 216; *Royer, supra*, at 501 (plurality opinion); *United States* v. *Mendenhall*, 446 U. S. 544, 557–558 (1980); and request consent to search his or her luggage, see *Royer, supra*, at 501 (plurality opinion)—as long as the police do not convey a message that compliance with their requests is required.

Bostick insists that this case is different because it took place in the cramped confines of a bus. A police encounter is much more intimidating in this setting, he argues, because police tower over a seated passenger and there is little room to move around. Bostick claims to find support in language from *Michigan* v. *Chesternut*, 486 U. S. 567, 573 (1988), and other cases, indicating that a seizure occurs when a reasonable person would believe that he or she is not "free to leave." Bostick maintains that a reasonable bus passenger would not have felt free to leave under the circumstances of this case because there is nowhere to go on a bus. Also, the bus was about to depart. Had Bostick disembarked, he would have risked being stranded and losing whatever baggage he had locked away in the luggage compartment.

The Florida Supreme Court found this argument persuasive, so much so that it adopted a *per se* rule prohibiting the police from randomly boarding buses as a means of drug interdiction. The state court erred, however, in focusing on whether Bostick was "free to leave" rather than on the principle that those words were intended to capture. When police attempt to question a person who is walking down the street or through an airport lobby, it makes sense to inquire whether a reasonable person would feel free to continue walking. But when the person is seated on a bus and has no desire to leave, the degree to which a reasonable person

would feel that he or she could leave is not an accurate measure of the coercive effect of the encounter.

Here, for example, the mere fact that Bostick did not feel free to leave the bus does not mean that the police seized him. Bostick was a passenger on a bus that was scheduled to depart. He would not have felt free to leave the bus even if the police had not been present. Bostick's movements were "confined" in a sense, but this was the natural result of his decision to take the bus; it says nothing about whether or not the police conduct at issue was coercive.

In this respect, the Court's decision in *INS* v. *Delgado*, *supra*, is dispositive. At issue there was the INS' practice of visiting factories at random and questioning employees to determine whether any were illegal aliens. Several INS agents would stand near the building's exits, while other agents walked through the factory questioning workers. The Court acknowledged that the workers may not have been free to leave their worksite, but explained that this was not the result of police activity: "Ordinarily, when people are at work their freedom to move about has been meaningfully restricted, not by the actions of law enforcement officials, but by the workers' voluntary obligations to their employers." *Id.*, at 218. We concluded that there was no seizure because, even though the workers were not free to leave the building without being questioned, the agents' conduct should have given employees "no reason to believe that they would be detained if they gave truthful answers to the questions put to them or if they simply refused to answer." *Ibid.*

The present case is analytically indistinguishable from *Delgado*. Like the workers in that case, Bostick's freedom of movement was restricted by a factor independent of police conduct—*i. e.*, by his being a passenger on a bus. Accordingly, the "free to leave" analysis on which Bostick relies is inapplicable. In such a situation, the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter. This

formulation follows logically from prior cases and breaks no new ground. We have said before that the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would "have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Chesternut, supra,* at 569. See also *Hodari D.,* 499 U. S., at 628. Where the encounter takes place is one factor, but it is not the only one. And, as the Solicitor General correctly observes, an individual may decline an officer's request without fearing prosecution. See Brief for United States as *Amicus Curiae* 25. We have consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure. See *Delgado, supra,* at 216–217; *Royer,* 460 U. S., at 498 (plurality opinion); *Brown* v. *Texas,* 443 U. S. 47, 52–53 (1979).

The facts of this case, as described by the Florida Supreme Court, leave some doubt whether a seizure occurred. Two officers walked up to Bostick on the bus, asked him a few questions, and asked if they could search his bags. As we have explained, no seizure occurs when police ask questions of an individual, ask to examine the individual's identification, and request consent to search his or her luggage—so long as the officers do not convey a message that compliance with their requests is required. Here, the facts recited by the Florida Supreme Court indicate that the officers did not point guns at Bostick or otherwise threaten him and that they specifically advised Bostick that he could refuse consent.

Nevertheless, we refrain from deciding whether or not a seizure occurred in this case. The trial court made no express findings of fact, and the Florida Supreme Court rested its decision on a single fact—that the encounter took place on a bus—rather than on the totality of the circumstances. We remand so that the Florida courts may evaluate the seizure question under the correct legal standard. We do reject, however, Bostick's argument that he must have been seized

because no reasonable person would freely consent to a search of luggage that he or she knows contains drugs. This argument cannot prevail because the "reasonable person" test presupposes an *innocent* person. See *Royer, supra,* at 519, n. 4 (BLACKMUN, J., dissenting) ("The fact that [respondent] knew the search was likely to turn up contraband is of course irrelevant; the potential intrusiveness of the officers' conduct must be judged from the viewpoint of an innocent person in [his] position"). Accord, *Chesternut,* 486 U. S., at 574 ("This 'reasonable person' standard . . . ensures that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being approached").

The dissent characterizes our decision as holding that police may board buses and by an *"intimidating* show of authority," *post,* at 447 (emphasis added), demand of passengers their "voluntary" cooperation. That characterization is incorrect. Clearly, a bus passenger's decision to cooperate with law enforcement officers authorizes the police to conduct a search without first obtaining a warrant *only* if the cooperation is voluntary. "Consent" that is the product of official intimidation or harassment is not consent at all. Citizens do not forfeit their constitutional rights when they are coerced to comply with a request that they would prefer to refuse. The question to be decided by the Florida courts on remand is whether Bostick chose to permit the search of his luggage.

The dissent also attempts to characterize our decision as applying a lesser degree of constitutional protection to those individuals who travel by bus, rather than by other forms of transportation. This, too, is an erroneous characterization. Our Fourth Amendment inquiry in this case—whether a reasonable person would have felt free to decline the officers' requests or otherwise terminate the encounter—applies equally to police encounters that take place on trains, planes, and city streets. It is the dissent that would single out this particu-

lar mode of travel for differential treatment by adopting a *per se* rule that random bus searches are unconstitutional.

The dissent reserves its strongest criticism for the proposition that police officers can approach individuals as to whom they have no reasonable suspicion and ask them potentially incriminating questions. But this proposition is by no means novel; it has been endorsed by the Court any number of times. *Terry, Royer, Rodriguez,* and *Delgado* are just a few examples. As we have explained, today's decision follows logically from those decisions and breaks no new ground. Unless the dissent advocates overruling a long, unbroken line of decisions dating back more than 20 years, its criticism is not well taken.

This Court, as the dissent correctly observes, is not empowered to suspend constitutional guarantees so that the Government may more effectively wage a "war on drugs." See *post*, at 440, 450–451. If that war is to be fought, those who fight it must respect the rights of individuals, whether or not those individuals are suspected of having committed a crime. By the same token, this Court is not empowered to forbid law enforcement practices simply because it considers them distasteful. The Fourth Amendment proscribes unreasonable searches and seizures; it does not proscribe voluntary cooperation. The cramped confines of a bus are one relevant factor that should be considered in evaluating whether a passenger's consent is voluntary. We cannot agree, however, with the Florida Supreme Court that this single factor will be dispositive in every case.

We adhere to the rule that, in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter. That rule applies to encounters that take place on a city street or in an airport lobby, and it applies equally to

encounters on a bus. The Florida Supreme Court erred in adopting a *per se* rule.

The judgment of the Florida Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE MARSHALL, with whom JUSTICE BLACKMUN and JUSTICE STEVENS join, dissenting.

Our Nation, we are told, is engaged in a "war on drugs." No one disputes that it is the job of law-enforcement officials to devise effective weapons for fighting this war. But the effectiveness of a law-enforcement technique is not proof of its constitutionality. The general warrant, for example, was certainly an effective means of law enforcement. Yet it was one of the primary aims of the Fourth Amendment to protect citizens from the tyranny of being singled out for search and seizure without particularized suspicion *notwithstanding* the effectiveness of this method. See *Boyd* v. *United States*, 116 U. S. 616, 625–630 (1886); see also *Harris* v. *United States*, 331 U. S. 145, 171 (1947) (Frankfurter, J., dissenting). In my view, the law-enforcement technique with which we are confronted in this case—the suspicionless police sweep of buses in intrastate or interstate travel—bears all of the indicia of coercion and unjustified intrusion associated with the general warrant. Because I believe that the bus sweep at issue in this case violates the core values of the Fourth Amendment, I dissent.

I

At issue in this case is a "new and increasingly common tactic in the war on drugs": the suspicionless police sweep of buses in interstate or intrastate travel. *United States* v. *Lewis*, 287 U. S. App. D. C. 306, 307, 921 F. 2d 1294, 1295 (1990); see *United States* v. *Flowers*, 912 F. 2d 707, 710 (CA4 1990) (describing technique in Charlotte, North Carolina); *United States* v. *Madison*, 936 F. 2d 90, 91 (CA2 1991) (de-

scribing technique in Port Authority terminal in New York City); *United States* v. *Chandler*, 744 F. Supp. 333, 335 (DC 1990) ("[I]t has become routine to subject interstate travelers to warrantless searches and intimidating interviews while sitting aboard a bus stopped for a short layover in the Capital"); 554 So. 2d 1153, 1156–1157 (Fla. 1989) (describing Florida police policy of "'working the buses'"); see also *ante,* at 431. Typically under this technique, a group of state or federal officers will board a bus while it is stopped at an intermediate point on its route. Often displaying badges, weapons or other indicia of authority, the officers identify themselves and announce their purpose to intercept drug traffickers. They proceed to approach individual passengers, requesting them to show identification, produce their tickets, and explain the purpose of their travels. Never do the officers advise the passengers that they are free not to speak with the officers. An "interview" of this type ordinarily culminates in a request for consent to search the passenger's luggage. See generally *United States* v. *Lewis, supra,* at 308, 921 F. 2d, at 1296; *United States* v. *Flowers, supra,* at 708–709; *United States* v. *Madison, supra,* at 91; 554 So. 2d, at 1154.

These sweeps are conducted in "dragnet" style. The police admittedly act without an "articulable suspicion" in deciding which buses to board and which passengers to approach for interviewing.[1] By proceeding systematically in this

---

[1] That is to say, the police who conduct these sweeps decline to offer a reasonable, articulable suspicion of criminal wrongdoing sufficient to justify a warrantless "stop" or "seizure" of the confronted passenger. See *Terry* v. *Ohio,* 392 U. S. 1, 20–22, 30–31 (1968); *Florida* v. *Royer,* 460 U. S. 491, 498–499 (1983) (plurality opinion). It does not follow, however, that the approach of passengers during a sweep is completely random. Indeed, at least one officer who routinely confronts interstate travelers candidly admitted that *race* is a factor influencing his decision whom to approach. See *United States* v. *Williams,* No. 1:89CR0135 (ND Ohio, June 13, 1989), p. 3 ("Detective Zaller testified that the factors initiating the focus upon the three young black males in this case included: (1) that they were young and black . . . ."), aff'd, No. 89–4083 (CA6, Oct. 19, 1990), p. 7

fashion, the police are able to engage in a tremendously high volume of searches. See, *e. g., Florida* v. *Kerwick*, 512 So. 2d 347, 348–349 (Fla. App. 1987) (single officer employing sweep technique able to search over 3,000 bags in nine-month period). The percentage of successful drug interdictions is low. See *United States* v. *Flowers, supra,* at 710 (sweep of 100 buses resulted in seven arrests).

To put it mildly, these sweeps "are inconvenient, intrusive, and intimidating." *United States* v. *Chandler,* 744 F. Supp., at 335. They occur within cramped confines, with officers typically placing themselves in between the passenger selected for an interview and the exit of the bus. See, *e. g., id.,* at 336. Because the bus is only temporarily stationed at a point short of its destination, the passengers are in no position to leave as a means of evading the officers' questioning. Undoubtedly, such a sweep holds up the progress of the bus. See *United States* v. *Fields,* 909 F. 2d 470, 474 n. 2 (CA11 1990); cf. *United States* v. *Rembert,* 694 F. Supp. 163, 175 (WDNC 1988) (reporting testimony of officer that he makes "'every effort in the world not to delay the bus'" but that the driver does not leave terminal until sweep is complete). Thus, this "new and increasingly common tactic," *United States* v. *Lewis, supra,* at 307, 921 F. 2d, at 1295, burdens the experience of traveling by bus with a degree of governmental interference to which, until now, our society has been proudly unaccustomed. See, *e. g., State ex rel. Ekstrom* v. *Justice Court,* 136 Ariz. 1, 6, 663 P. 2d 992, 997 (1983) (Feldman, J., concurring) ("The thought that an American can be compelled to 'show his papers' before exercising his right to walk the streets, drive the highways or board the trains is repugnant to American institutions and ideals").

---

(the officers "knew that the couriers, more often than not, were young black males"), vacated and remanded, 500 U. S. 901 (1991). Thus, the basis of the decision to single out particular passengers during a suspicionless sweep is less likely to be *inarticulable* than *unspeakable.*

This aspect of the suspicionless sweep has not been lost on many of the lower courts called upon to review the constitutionality of this practice. Remarkably, the courts located at the heart of the "drug war" have been the most adamant in condemning this technique As one Florida court put it:

> " '[T]he evidence in this cause has evoked images of other days, under other flags, when no man traveled his nation's roads or railways without fear of unwarranted interruption, by individuals who held temporary power in the Government. The spectre of American citizens being asked, by badge-wielding police, for identification, travel papers—in short a *raison d'etre*—is foreign to *any* fair reading of the Constitution, and its guarantee of human liberties. This is not Hitler's Berlin, nor Stalin's Moscow, nor is it white supremacist South Africa. Yet in Broward County, Florida, these police officers approach every person on board buses and trains ("that time permits") and check identification [and] tickets, [and] ask to search luggage—all in the name of "voluntary cooperation" with law enforcement . . . .' " 554 So. 2d, at 1158, quoting *State* v. *Kerwick, supra,* at 348–349 (quoting trial court order).

The District Court for the District of Columbia spoke in equally pointed words:

> "It seems rather incongruous at this point in the world's history that we find totalitarian states becoming more like our free society while we in this nation are taking on their former trappings of suppressed liberties and freedoms."

>      .          .          .          .          .

> "The random indiscriminate stopping and questioning of individuals on interstate busses seems to have gone too far. If this Court approves such 'bus stops' and allows prosecutions to be based on evidence seized as a result of such 'stops,' then we will have stripped our

citizens of basic Constitutional protections. Such action would be inconsistent with what this nation has stood for during its 200 years of existence. If passengers on a bus passing through the Capital of this great nation cannot be free from police interference where there is absolutely no basis for the police officers to stop and question them, then the police will be free to accost people on our streets without any reason or cause. In this 'anything goes' war on drugs, random knocks on the doors of our citizens' homes seeking 'consent' to search for drugs cannot be far away. This is not America." *United States* v. *Lewis*, 728 F. Supp. 784, 788–789, rev'd, 287 U. S. App. D. C. 306, 921 F. 2d 1294 (1990).

See also *United States* v. *Alexander*, 755 F. Supp. 448, 453 (DC 1991); *United States* v. *Madison*, 744 F. Supp. 490, 495–497 (SDNY 1990), rev'd, 936 F. 2d 90 (CA2 1991); *United States* v. *Chandler, supra*, at, 335–336; *United States* v. *Mark*, 742 F. Supp. 17, 18–19 (DC 1990); *United States* v. *Alston*, 742 F. Supp. 13, 15 (DC 1990); *United States* v. *Cothran*, 729 F. Supp. 153, 156–158 (DC 1990), rev'd, 287 U. S. App. D. C. 306, 921 F. 2d 1294 (1990); *United States* v. *Felder*, 732 F. Supp. 204, 209 (DC 1990).

The question for this Court, then, is whether the suspicionless, dragnet-style sweep of buses in intrastate and interstate travel is consistent with the Fourth Amendment. The majority suggests that this latest tactic in the drug war is perfectly compatible with the Constitution. I disagree.

## II

I have no objection to the manner in which the majority frames the test for determining whether a suspicionless bus sweep amounts to a Fourth Amendment "seizure." I agree that the appropriate question is whether a passenger who is approached during such a sweep "would feel free to decline the officers' requests or otherwise terminate the encounter."

*Ante*, at 436. What I cannot understand is how the majority can possibly suggest an affirmative answer to this question.

The majority reverses what it characterizes as the Florida Supreme Court's *"per se* rule" against suspicionless encounters between the police and bus passengers, see *ante*, at 433, 435–440, suggesting only in dictum its "doubt" that a seizure occurred on the facts of this case, see *ante*, at 437. However, the notion that the Florida Supreme Court decided this case on the basis of any *"per se* rule" *independent* of the facts of this case is wholly a product of the majority's imagination. As the majority acknowledges, the Florida Supreme Court "stated explicitly the factual premise for its decision." *Ante*, at 431. This factual premise contained *all* of the details of the encounter between respondent and the police. See 554 So. 2d, at 1154; *ante*, at 431–432. The lower court's analysis of whether respondent was seized drew heavily on these facts, and the court repeatedly emphasized that its conclusion was based on *"all the circumstances"* of this case. 554 So. 2d, at 1157 (emphasis added); see *ibid. ("Here, the circumstances indicate* that the officers effectively 'seized' [respondent]" (emphasis added)).

The majority's conclusion that the Florida Supreme Court, contrary to all appearances, *ignored* these facts is based solely on the failure of the lower court to expressly incorporate all of the facts into its reformulation of the certified question on which respondent took his appeal. See *ante*, at 433.[2] The majority never explains the basis of its implausible assumption that the Florida Supreme Court intended its phrasing of the certified question to trump its opinion's careful treatment of the facts in this case. Certainly, when *this* Court issues an opinion, it does not intend lower courts and

---

[2] As reformulated, this question read:

"Does an impermissible seizure result when police mount a drug search on buses during scheduled stops and question boarded passengers without articulable reasons for doing so, thereby obtaining consent to search the passengers' luggage?" 554 So. 2d, at 1154.

parties to treat as irrelevant the analysis of facts that the parties neglected to cram into the question presented in the petition for certiorari. But in any case, because the issue whether a seizure has occurred in any given factual setting is a question of law, see *United States* v. *Mendenhall*, 446 U. S. 544, 554–555 (1980) (opinion of Stewart, J.); *United States* v. *Maragh*, 282 U. S. App. D. C. 256, 258–259, 894 F. 2d 415, 417–418 (CADC), cert. denied, 498 U. S. 880 (1990), nothing prevents this Court from deciding on its own whether a seizure occurred based on *all* of the facts of this case as they appear in the opinion of the Florida Supreme Court.

These facts exhibit all of the elements of coercion associated with a typical bus sweep. Two officers boarded the Greyhound bus on which respondent was a passenger while the bus, en route from Miami to Atlanta, was on a brief stop to pick up passengers in Fort Lauderdale. The officers made a visible display of their badges and wore bright green "raid" jackets bearing the insignia of the Broward County Sheriff's Department; one held a gun in a recognizable weapons pouch. See 554 So. 2d, at 1154, 1157. These facts alone constitute an intimidating "show of authority." See *Michigan* v. *Chesternut*, 486 U. S. 567, 575 (1988) (display of weapon contributes to coercive environment); *United States* v. *Mendenhall*, *supra*, at 554 (opinion of Stewart, J.) ("threatening presence of several officers" and "display of a weapon"); *id.*, at 555 (uniformed attire). Once on board, the officers approached respondent, who was sitting in the back of the bus, identified themselves as narcotics officers and began to question him. See 554 So. 2d, at 1154. One officer stood in front of respondent's seat, partially blocking the narrow aisle through which respondent would have been required to pass to reach the exit of the bus. See *id.*, at 1157.

As far as is revealed by facts on which the Florida Supreme Court premised its decision, the officers did not advise respondent that he was free to break off this "interview." Inexplicably, the majority repeatedly stresses the trial court's

implicit finding that the police officers advised respondent that he was free to refuse permission to search his travel bag. See *ante*, at 432, 437–438. This aspect of the exchange between respondent and the police is completely irrelevant to the issue before us. For as the State concedes, and as the majority purports to "accept," *id.*, at 433–434, *if* respondent was unlawfully seized when the officers approached him and initiated questioning, the resulting search was likewise unlawful no matter how well advised respondent was of his right to refuse it. See *Florida* v. *Royer*, 460 U. S. 491, 501, 507–508 (1983) (plurality opinion); *Wong Sun* v. *United States*, 371 U. S. 471 (1963). Consequently, the issue is not whether a passenger in respondent's position would have felt free to deny consent to the search of his bag, but whether such a passenger—without being apprised of his rights— would have felt free to terminate the antecedent encounter with the police.

Unlike the majority, I have no doubt that the answer to this question is no. Apart from trying to accommodate the officers, respondent had only two options. First, he could have remained seated while obstinately refusing to respond to the officers' questioning. But in light of the intimidating show of authority that the officers made upon boarding the bus, respondent reasonably could have believed that such behavior would only arouse the officers' suspicions and intensify their interrogation. Indeed, officers who carry out bus sweeps like the one at issue here frequently admit that this is the effect of a passenger's refusal to cooperate. See, *e. g.*, *United States* v. *Cothran*, 729 F. Supp., at 156; *United States* v. *Felder*, 732 F. Supp., at 205. The majority's observation that a mere refusal to answer questions, "without more," does not give rise to a reasonable basis for seizing a passenger, *ante*, at 437, is utterly beside the point, because a passenger unadvised of his rights and otherwise unversed in constitutional law *has no reason to know* that the police cannot hold his refusal to cooperate against him.

Second, respondent could have tried to escape the officers' presence by leaving the bus altogether. But because doing so would have required respondent to squeeze past the gun-wielding inquisitor who was blocking the aisle of the bus, this hardly seems like a course that respondent reasonably would have viewed as available to him.[3] The majority lamely protests that nothing in the stipulated facts shows that the questioning officer "*point[ed]* [his] gu[n] at [respondent] or otherwise *threaten[ed]* him" with the weapon. *Ante*, at 437 (emphasis added). Our decisions recognize the obvious point, however, that the choice of the police to "display" their weapons during an encounter exerts significant coercive pressure on the confronted citizen. *E. g., Michigan* v. *Chesternut, supra,* at 575; *United States* v. *Mendenhall, supra,* at 554. We have never suggested that the police must go so far as to put a citizen in immediate apprehension of *being shot* before a court can take account of the intimidating effect of being questioned by an officer with weapon in hand.

Even if respondent had perceived that the officers would *let* him leave the bus, moreover, he could not reasonably have been expected to resort to this means of evading their intrusive questioning. For so far as respondent knew, the bus' departure from the terminal was imminent. Unlike a person approached by the police on the street, see *Michigan* v. *Chesternut, supra,* or at a bus or airport terminal after reaching his destination, see *United States* v. *Mendenhall, supra,* a passenger approached by the police at an intermediate point in a long bus journey cannot simply leave the scene and repair to a safe haven to avoid unwanted probing by law-enforcement officials. The vulnerability that an intrastate or interstate traveler experiences when confronted by the police outside of his "own familiar territory" surely aggravates

---

[3] As the majority's discussion makes plain, see *ante,* at 432, 437, the officer questioning respondent clearly carried a weapons pouch during the interview. See also 554 So. 2d, at 1157.

the coercive quality of such an encounter. See *Schneckloth* v. *Bustamonte*, 412 U. S. 218, 247 (1973).

The case on which the majority primarily relies, *INS* v. *Delgado*, 466 U. S. 210 (1984), is distinguishable in every relevant respect. In *Delgado*, this Court held that workers approached by law-enforcement officials inside of a factory were not "seized" for purposes of the Fourth Amendment. The Court was careful to point out, however, that the presence of the agents did not furnish the workers with a reasonable basis for believing that they were not free to leave the factory, as at least some of them did. See *id.*, at 218–219, and n. 7. Unlike passengers confronted by law-enforcement officials on a bus stopped temporarily at an intermediate point in its journey, workers approached by law-enforcement officials at their workplace need not abandon personal belongings and venture into unfamiliar environs in order to avoid unwanted questioning. Moreover, the workers who did not leave the building in *Delgado* remained free to move about the entire factory, see *id.*, at 218, a considerably less confining environment than a bus. Finally, contrary to the officer who confronted respondent, the law-enforcement officials in *Delgado* did not conduct their interviews with guns in hand. See *id.*, at 212.

Rather than requiring the police to justify the coercive tactics employed here, the majority blames respondent for his own sensation of constraint. The majority concedes that respondent "did not feel free to leave the bus" as a means of breaking off the interrogation by the Broward County officers. *Ante*, at 436. But this experience of confinement, the majority explains, "was the natural result of *his* decision to take the bus." *Ibid.* (emphasis added). Thus, in the majority's view, because respondent's "freedom of movement was restricted by a factor independent of police conduct — *i. e.*, by his being a passenger on a bus," *ante*, at 436 — respondent was not seized for purposes of the Fourth Amendment.

This reasoning borders on sophism and trivializes the values that underlie the Fourth Amendment. Obviously, a person's "voluntary decision" to place himself in a room with only one exit does not authorize the police to force an encounter upon him by placing themselves in front of the exit. It is no more acceptable for the police to force an encounter on a person by exploiting his "voluntary decision" to expose himself to perfectly legitimate personal or social constraints. By consciously deciding to single out persons who have undertaken interstate or intrastate travel, officers who conduct suspicionless, dragnet-style sweeps put passengers to the choice of cooperating or of exiting their buses and possibly being stranded in unfamiliar locations. It is exactly because this "choice" is no "choice" at all that police engage this technique.

In my view, the Fourth Amendment clearly condemns the suspicionless, dragnet-style sweep of intrastate or interstate buses. Withdrawing this particular weapon from the government's drug-war arsenal would hardly leave the police without any means of combatting the use of buses as instrumentalities of the drug trade. The police would remain free, for example, to approach passengers whom they have a reasonable, articulable basis to suspect of criminal wrongdoing.[4] Alternatively, they could continue to confront passengers without suspicion so long as they took simple steps, like advising the passengers confronted of their right to decline to be questioned, to dispel the aura of coercion and intimidation that pervades such encounters. There is no reason to expect that such requirements would render the Nation's buses law-enforcement-free zones.

### III

The majority attempts to gloss over the violence that today's decision does to the Fourth Amendment with empty admonitions. "If th[e] [war on drugs] is to be fought," the ma-

---

[4] Insisting that police officers explain their decision to single out a particular passenger for questioning would help prevent their reliance on impermissible criteria such as race. See n. 1, *supra*.

jority intones, "those who fight it must respect the rights of individuals, whether or not those individuals are suspected of having committed a crime." *Ante*, at 439. The majority's actions, however, speak louder than its words.

I dissent.