Plaintiff-appellant the State of Ohio appeals from a suppression order. The State contends that the trial court erred when it found that defendant-appellee Charles Cavanaugh's consent to search was involuntary. Based upon the totality of circumstances, we agree. Accordingly, the judgment of the trial court is Reversed, and this cause is Remanded for further proceedings consistent with this opinion.
 I
Cavanaugh was a passenger on a Greyhound bus that was stopped at the Dayton bus station between 9:00 and 9:15 a.m. one August morning. Dayton police sergeant Randall Warren and Dayton police detective Lee Lubonovic were at the station checking buses, coming and going. The officers had no particular reason to suspect contraband or other criminal activity, but apparently routinely checked buses headed south or west, time permitting. A third police officer checked the baggage stored underneath the bus, using a drug-sniffing dog.
Warren and Lubonovic were in uniform, and were wearing holstered firearms. They boarded the bus after any people that wanted to exit the bus had done so. Pursuant to their routine, Warren boarded the bus first, and walked to the back of the bus, with Lubonovic following him. Lubonovic started with the person in the very last seat of the bus on the driver's side, by asking each passenger four questions: (1) where are you coming from; (2) where are you going to; (3) do you have your ticket; and (4) are you carrying any carry-on bags on board the bus? In the experience of the officers, drug carriers will frequently discard their tickets, not wanting others to know where they have been and where they are going. The purpose of the fourth question is to match passengers with carry-on luggage. Lubonovic asked the questions, and it was Warren's responsibility to note any bags in the overhead rack that did not appear to be claimed by any of the passengers.
The very last seat on the bus was occupied by Charles Wilson. Cavanaugh was seated in front of Wilson, with an empty seat in between them. Both Wilson and Cavanaugh told Lubonovic that they did not have any bags in the overhead rack. Warren remained at the very back of the bus, with his back against the door to the restroom. Lubonovic continued up the aisle of the bus, asking questions. By the time Lubonovic was more than halfway up the aisle, it became apparent to Warren that nobody was claiming two bags in the overhead rack in the vicinity of Wilson and Cavanaugh.
Warren asked Wilson if the bags in the overhead rack belonged to him. Wilson responded that his bag was under his seat, but appeared genuinely perplexed when he looked under his seat and his bag was missing. He then identified one of the unclaimed bags as his, indicating that he had mistakenly thought that he had the bag under his seat. Cavanaugh then identified the other bag as his. The bag was located in the overhead luggage rack over the empty seat between Cavanaugh and Wilson. Without removing the bag from the overhead rack, Warren asked Cavanaugh if he minded if Warren checked the bag. What happened at this point was described by Warren as follows:
Q. And what occurred next?
 A. Mr. Cavanaugh, of course, was seated almost directly beside me. And I asked him if he minded if I checked that bag, at which time he responded something to the effect about, "Sure, go ahead," or "I don't mind," or something to that effect.
 Q. Okay. And when you were talking to Mr. Cavanaugh at that point, what was his general condition when you were looking at him? Was he tired? Was he anything other than coherent?
 A. He didn't appear to be other than what I would consider normal.
 Q. Did he appear to be under the influence of any kind of drugs or anything of that nature?
A. Not that I noticed.
 Q. Did he appear to be tired or nervous or anything out of the ordinary?
A. No.
 Q. Okay. And when he had indicated his willingness to let you — how did you phrase it? Wanted to check the bag?
A. That's correct.
 Q. Okay. And after his response in allowing you to do so, what happened?
 A. I reached up, and I took the bag from the overhead compartment. And I laid it on the empty seat which was between himself and Mr. Wilson. I unzipped the bag. And in the bag was some personal articles, some clothing. I believe there was even a picture, like a 5-by-7 or 8-by-11 picture of somebody. And then there was a shaving kit that was laying right on top with those items.
Q. What kind of a shaving kit is that?
A. I want to say it was like a vinyl-type shaving kit.
 Q. You're making a gesture like it's somewhat less than that foot —
 A. Maybe 10 inches long, 6 inches wide, something to that effect.
Q. What did you do at that point?
 A. I asked Mr. Cavanaugh if the shaving kit was his, and he did acknowledge the bag. He said yes. I said, "Do you mind if I check the shaving kit?" He said, "Go ahead."
Warren found a loaded .22-caliber revolver in the shaving kit. Cavanaugh was arrested and charged with Carrying a Concealed Weapon. He filed a motion to suppress. Following a hearing, Cavanaugh's motion to suppress was granted. The State appeals from the suppression order.
 II
The State's sole Assignment of Error is as follows:
 THE TRIAL COURT ERRED IN GRANTING APPELLEE'S MOTION TO SUPPRESS WHEN IT HELD THAT THE CONSENT TO SEARCH GIVEN BY APPELLEE WAS INVOLUNTARY.
Both parties and the trial court cite Florida v.Bostick (1990), 501 U.S. 429, for the proposition that the Fourth Amendment permits police officers to approach individuals at random on buses to ask them questions and to request consent to search their luggage so long as a reasonable person would understand that he or she may refuse to cooperate. The appropriate test is whether, taking into account all of the circumstances surrounding the encounter, a reasonable passenger would feel free to decline the officer's requests or otherwise to terminate the encounter. Id. at 433-437. Although the facts inBostick are very similar to the facts in the case before us, there is one important difference; in Bostick, the officers informed the defendant that he had the right to refuse to have his luggage searched. Id., at 432.
In its conclusion that the circumstances were such that a reasonable person in Cavanaugh's position would be of the opinion that he was not free to decline the officer's request or otherwise to terminate the encounter, the trial court relied on the following circumstances: "the cramped confines of the bus; the fact that Detective Lubonovic was standing in the aisle way four feet from the Defendant tending to show that his passage off the bus was blocked; the fact that Sgt. Warren apparently did not feel that the answers given by the Defendant to the four questions asked by Detective Lubonovic were important as evidenced by Sgt. Warren's failure to recall the answers in his testimony at the hearing; and the fact that the defendant was not told on either occasion that he could refuse or withdraw his consent or not give it at all when Sgt. Warren asked for consent to search."
In its recitation of the circumstances, the trial court appears to have committed at least one error of fact. The only witness to testify at the suppression hearing was Warren, and his unrebutted testimony was that Lubonovic had made his way halfway up the aisle, or about twenty feet from the back of the bus, before Warren engaged Wilson and Cavanaugh in conversation. Furthermore, Warren's unrebutted testimony was that Cavanaugh was not blocking passengers' ingress and egress, but was permitting passengers returning to the bus, or leaving the bus, to pass him in the aisle, holding himself to one side of the aisle, which was nearly two feet wide.
Furthermore, we attach no significance to Warren's failure to recall the answer that Cavanaugh gave to Lubonovic's questions. Warren's only concern was to identify and account for any unclaimed bags. Thus, his only interest in the responses to Lubonovic's questions was to determine which bags in the overhead rack were being claimed, because, in his experience, drug couriers frequently do not claim possession of bags containing contraband. Warren testified that if any bags were ultimately unclaimed by anyone on the bus, it was his practice to ask the bus driver for permission to remove those bags from the bus.
Thus, of the circumstances recited by the trial court, the only one that we view as being material is the fact that Cavanaugh was not advised that he had the right to refuse Warren's request to search his bag. However, it is clear from a reading of Bostick
that advising a citizen of his right to refuse consent to search is not an essential predicate to the giving of an effective, voluntary consent. Furthermore, we know from Ohio v. Robinette
(1996), 519 U.S. _______, 117 S.Ct. 417, that the United States Supreme Court has rejected the proposition that a citizen must be advised of his right to refuse consent as a bright-line, prophylactic rule in cases involving encounters between citizens and police officers.
In our view, the fact that Warren asked Cavanaugh, before laying hands on his luggage, if he minded if Warren searched his bag, in what Warren testified was a normal tone of voice, would indicate to a reasonable person in Cavanaugh's position that he was not under any official compulsion to give consent. Based upon existing Fourth Amendment jurisprudence, we conclude that a reasonable person in Cavanaugh's position would understand that he or she was free to refuse consent to search the bag.
The State's sole Assignment of Error is sustained.
 III
The State's sole Assignment of Error having been sustained, the judgment of the trial court is Reversed, and this cause isRemanded for further proceedings consistent with this opinion.
BROGAN and GRADY, JJ., concur.
Copies mailed to:
John J. Amarante
Suzanne M. Lough Wynn
Hon. David Gowdown