**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-4610
_____

UNITED STATES OF AMERICA

v.

DAMIEN HAMMONDS,
a/k/a Hondo,

Appellant
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
No. 1-11-cr-00166-001
District Judge:  Hon. Christopher C. Conner
_____

Submitted Under Third Circuit LAR 34.1(a)
July 8, 2014
_____

Before: SMITH, VANASKIE, and SHWARTZ, Circuit Judges.

(Filed: July 9, 2014)
_____

OPINION
_____

SHWARTZ, Circuit Judge.

Damien Hammonds was convicted for his role in a crack and powder cocaine

distribution conspiracy.  His only argument on appeal is that the District Court erred by

denying his motion to suppress evidence.  The District Court properly denied the motion

so we will affirm.

## I

As we write principally for the parties, we recount only the essential facts. On June 2, 2010, Marcelo Calderon-Ortiz and Richard Rondon-Diaz, two of Hammonds's co-defendants, flew from Philadelphia to San Juan, Puerto Rico. When they went through security at Philadelphia International Airport, TSA officers observed that they had significant amounts of cash in their carry-on luggage. The TSA officers attempted to contact the DEA team at the Philadelphia airport, but failed to do so before the flight to San Juan departed. The Philadelphia DEA team then contacted the DEA airport interdiction group in San Juan, Puerto Rico, provided descriptions of Calderon-Ortiz and Rondon-Diaz, and told the San Juan team they were carrying cash.

A team of four or five plainclothes agents from the San Juan airport interdiction group identified Calderon-Ortiz and Rondon-Diaz as they got off the plane and approached them in the baggage area of the terminal. As the agents spoke to Calderon-Ortiz and Rondon-Diaz in Spanish, Hammonds—who was, until then, unknown to the agents—approached the group and volunteered in English that he was traveling with Calderon-Ortiz and Rondon-Diaz.[1] The agents then told Hammonds that they were from the DEA and asked him for identification. When Hammonds reached in his pocket to

---

[1] In its brief, the Government inexplicably asserts that "Hammonds and two co-defendants were approached and interviewed by" the DEA interdiction group. Appellee Br. 15. Hammonds himself testified, consistent with the agents' testimony—and as found by the District Court—that it was he who approached law enforcement officers, not the other way around. As the Government correctly notes, "[i]t is the district court's findings of fact and conclusion[s] of law that are subject to review by this Court," Appellee Br. 19, so we will rely on the record and the District Court's finding of this uncontroverted fact, and not the Government's mistaken assertion.

2

retrieve his identification card, one of the agents saw that he had "bundles of U.S. currency in his pants pocket." App. 97. In response to a question from the agent, Hammonds confirmed that he had money in his pocket. An agent then asked Hammonds, Calderon-Ortiz, and Rondon-Diaz if they would accompany the team to the DEA office. The agent told the three men that they were free to leave, that they were not under arrest, and that the questioning was "just an administrative procedure."[2] App. 97. The three men agreed to go with the agents.

The team then escorted the three men to the DEA office, which was located in a secure part of the airport, with agents in front of and behind the three men. The three men retained control of their baggage, identification documents, airline tickets, and currency. The three men were then placed in separate rooms. When Hammonds sat down, the agent accompanying him told him again that he was not under arrest and that he could leave at any time.[3] The door to the windowless room where Hammonds sat remained open during the discussion. The agents then asked Hammonds a few biographical questions and copied his identification card before questioning him about the source of the currency he was carrying.[4] He first said the money was from his construction job. In response to follow-up questions, he then added that "some of it's from savings." App. 102.

---

[2] Hammonds testified at the suppression hearing that the agents "actually told [him] to come" with them and that they never informed him that he was free to leave. App. 143. The District Court found the agent to be more credible than Hammonds on this issue. The District Court's credibility determinations are entitled to great deference. See United States v. Igbonwa, 120 F.3d 437, 441 (3d Cir. 1997).

[3] Again, the District Court credited the agent's testimony instead of Hammonds's contradictory testimony.

[4] During this time, the agents ran a background check and determined that Hammonds had a prior drug conviction.

3

After more questioning, Hammonds changed his story again, saying some of the cash came from his aunt. Hammonds asked to call the aunt to verify his story, and the agents permitted him to use the speakerphone in the room. The first call went to voicemail. On the second call, Hammonds told the woman on the other end that he had been stopped in Puerto Rico, and the woman hung up the phone. Hammonds called again, and began explaining to the woman that he had been stopped. The agents told the woman that the money would be subject to forfeiture if it was drug proceeds. She denied that the money was related to drugs, explained that she had given some money to Hammonds, and said that he had taken a few thousand extra dollars from her without her knowledge.

After hearing Hammonds's inconsistent explanations for the money, the agents sought his consent to search his luggage, which he gave, and he removed the money—about $6,000—from his pocket. The agents then brought a dog trained to detect drugs. The dog walked past Hammonds's luggage and the currency, which had been placed in an envelope. The dog alerted only to the odor of drugs emanating from the envelope.

The agents then met to discuss their conversations with the three men, and "realized there was a very big difference in terms of what these guys were telling [them]." App. 106. Calderon-Ortiz and Rondon-Diaz told the agents that they were traveling with Hammonds, that all of the money they possessed belonged to Hammonds, and that they were in Puerto Rico to purchase a kilogram of cocaine. The agents then seized the cash, which totaled a little over $22,000, and provided the three men receipts, after which the three men left the DEA office. Hammonds later called the DEA office for

4

assistance with a return ticket to Philadelphia (as the agents had confiscated his money), and the agents tried to work with the airline to get Hammonds a ticket back to Philadelphia that same day.

## II

Hammonds was indicted, along with eight other co-defendants.[5] The indictment charged Hammonds with one count of distribution and possession with the intent to distribute at least 280 grams of crack cocaine and 5 kilograms of powder cocaine, in violation of 28 U.S.C. § 841(a)(1), and one count of conspiracy to do the same, in violation of 21 U.S.C. § 846. Before trial, Hammonds moved to suppress the evidence the San Juan agents obtained, which he contended violated the Fourth Amendment. After a hearing, the District Court denied the motion, concluding that Hammonds was not seized and, in the alternative, that any seizure did not violate the Fourth Amendment because it was supported by a reasonable, articulable suspicion that Hammonds was committing or was about to commit a crime, and the detention was no more intrusive than necessary to confirm or dispel that suspicion.

Hammonds proceeded to trial, the jury convicted him on both counts, and the District Court sentenced him to concurrent terms of 240 months' imprisonment on each count.

## III

Hammonds appeals only the denial of his motion to suppress, arguing that the agents' investigatory stop evolved into a seizure without an arrest warrant or probable

---

[5] Hammonds's co-defendants all pled guilty.

cause.[6] We review a district court's factual findings for clear error and exercise plenary review of its application of the law to those facts. United States v. Perez, 280 F.3d 318, 336 (3d Cir. 2002). Clear error review is deferential. In cases "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer, 470 U.S. 564, 574 (1985); see also id. at 575 ("[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error."); United States v. Igbonwa, 120 F.3d 437, 441 (3d Cir. 1997) (holding that review of factual findings "is more deferential with respect to determinations about the credibility of witnesses") (citing Anderson, 470 U.S. at 575).

Hammonds challenges the District Court's factual finding that he was not under arrest and was free to leave. The District Court rejected Hammonds's assertion and found that the agents credibly testified that he was told he was free to leave. This conclusion is supported by, among other things, the fact that Hammonds approached the agents and retained his identification, airline tickets, and baggage, and thus had the means to leave at any time. Because the District Court's factual findings were based on credibility determinations and are not "internally inconsistent," Hammonds has not shown that they were clearly erroneous.

---

[6] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We exercise jurisdiction pursuant to 28 U.S.C. § 1291.

6

Plenary review of the District Court's application of law to those facts shows there was no error. To this end, we examine whether the Fourth Amendment applies to Hammonds's encounter with the interdiction team. An encounter with police is consensual "[s]o long as a reasonable person would feel free 'to disregard the police and go about his business.'" Florida v. Bostick, 501 U.S. 429, 434 (1991) (quoting California v. Hodari D., 499 U.S. 621, 628 (1991)). A consensual encounter "will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." Id.

Here, the encounter was consensual and Hammonds was therefore not seized. Unlike the defendant in Florida v. Royer, 460 U.S. 491 (1983),[7] Hammonds—and not the agents—initiated the encounter by approaching the agents. Moreover, the agents told Hammonds—both before and after they escorted him to the DEA office—that he was free to leave and that he was not under arrest or even under investigation. Furthermore, Hammonds retained possession of his identification and airline ticket except for the brief period of time when the agents made copies of those documents. Cf. id., 460 U.S. at 504 (observing that, "by returning [Royer's] ticket and driver's license, and informing him that he was free to go if he so desired, the officers may have obviated any claim that the encounter was anything but consensual from start to finish"). Taken as a whole, these circumstances demonstrate that Hammonds was free to end the encounter if he so chose.[8]

---

[7] In Royer, the Court held that the encounter was not consensual (and the defendant was thus seized) because the officers approached him, identified themselves as narcotics agents, told Royer he was suspected of transporting narcotics, asked him to accompany them to a police room, retained possession of his ticket and driver's licenses, claimed his baggage without his consent, and never told him that he was free to depart. Royer, 460 U.S. at 501.

[8] At the suppression hearing, Hammonds testified that he believed he could not walk away from the interdiction team, but he acknowledged that he was not handcuffed, he saw no weapons, he was not told he was under arrest, nobody searched him during the initial encounter, and no one physically compelled him to go to the

7

Even if Hammonds were correct that the encounter became nonconsensual at the time the agents escorted him to the DEA office, the agents by then had a reasonable, articulable suspicion that Hammonds was committing or about to commit a crime. "The principal components of a determination of reasonable suspicion . . . [are] the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion." Ornelas v. United States, 517 U.S. 690, 696 (1996). The determination of reasonable suspicion is properly based on "commonsense judgments and inferences about human behavior," Illinois v. Wardlow, 528 U.S. 119, 125 (2000), and law enforcement officers are permitted to take into account the "relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." Id. at 124.

In this case, before taking Hammonds to the DEA office, the agents knew: (1) Puerto Rico is a source area for drugs entering the continental United States from South America, Central America, and the Caribbean; (2) American citizens who fly into Puerto Rico are able to return to the continental United States without having to pass through customs, making it easier to bring drugs to the continental United States; (3) the proceeds from the sale of these drugs in the continental United States are often returned to Puerto Rico by Americans carrying large amounts of cash on their persons or in their carry-on

---

DEA office. Whatever Hammonds's subjective belief, it is clear from these facts that a reasonable person would have felt free to disregard the agents and go about his business—particularly where, as here, that person initiated the encounter with the agents in the first place. Cf. Bostick, 501 U.S. at 435-37 (holding that "no seizure occurs when police ask questions of an individual, ask to examine the individual's identification, and request consent to search his or her luggage—so long as the officers do not convey a message that compliance with their requests is required").

luggage; (4) when Hammonds saw the agents speaking with Calderon-Ortiz and Rondon-Diaz, he approached the agents and explained he was their traveling companion, which struck the agents as strange because Hammonds spoke only English while the other two spoke only Spanish; and (5) Hammonds, Calderon-Ortiz, and Rondon-Diaz were all carrying large sums of cash on their person or in their carry-on luggage, which fit the pattern for individuals bringing drug proceeds to Puerto Rico.  These circumstances provided the agents with a reasonable and articulable suspicion that Hammonds was engaged in a drug crime, and an investigatory stop was amply justified.

The agents' encounter with Hammonds after that point was limited and proportional to their need to confirm or dispel their suspicion.  The agents reminded Hammonds he was free to leave and left the door to the room open, and they never told him he was under investigation.  The agents never took his belongings from him except to make copies of his travel and identification documents.  Cf. Royer, 460 U.S. at 503 n.9 (noting that unlike the defendant in United States v. Mendenhall, 446 U.S. 544 (1980), Royer did not retain his identification or his luggage, which the officers collected for him, and therefore "[a]s a practical matter, Royer could not leave the airport").  Hammonds was allowed to call his aunt to try to verify one version of his story.[9]  Moreover, with Hammonds's consent, the agents used a drug-sniffing dog to search Hammonds's belongings as opposed to a more intrusive search, cf. id. at 505 (suggesting that the

---

[9] One of the agents testified that Hammonds never told his aunt that he was under arrest or anything to that effect.

9

officers could have used trained dogs), and did so only after Hammonds gave conflicting explanations for the source of his cash.

In short, the entire encounter continued only because Hammonds's answers became more suspicious and its duration was proportional to the need to investigate his explanations. Accordingly, even if we were to analyze the encounter under the investigatory stop rationale of <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), and its progeny, it is clear that the agents had reasonable suspicion to stop Hammonds and his Fourth Amendment rights were not violated.

**IV**

For the foregoing reasons, we will affirm Hammonds's judgment of conviction.