Filed 11/20/13  In re Armando R. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re ARMANDO R., a Person Coming Under the Juvenile Court Law. | C070867 |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ARMANDO R.,<br><br>Defendant and Appellant. | (Super. Ct. No. 69155) |

In March 2012 a petition was filed pursuant to Welfare and Institutions Code section 602 alleging the minor, Armando R., was in possession of a firearm (Pen. Code, § 29610) and in possession of ammunition (Pen. Code, § 29650), carrying a concealed weapon (Pen. Code, § 25400, subd. (a)), carrying a loaded firearm (Pen. Code, § 25850, subd. (a)), and committed a battery on school property (Pen. Code, § 243.2, subd. (a)). After denying the minor's motion to suppress evidence, the juvenile court sustained the petition and adjudged the minor a ward of the court.  On appeal, the minor contends his

1

suppression motion should have been granted because the juvenile court failed to consider all the relevant circumstances and there was not substantial evidence supporting the finding that the search of the minor was consensual. We shall affirm the judgment.

## BACKGROUND

In the late afternoon of March 15, 2012, Officer Luis Talamantes was on a routine patrol near the area of Stribley Park in Stockton. Two days earlier, Talamantes had been working a "violent crime mission," targeting areas of violent crime for increased patrols. Stribley Park is known as a "hang out" for Norteño gang members and is in a neighborhood well known for drug activity, shootings, robberies, and violent crime. Talamantes conducted his patrol there in an effort to continue the goals of the violent crime mission and determine if he could locate any problems or gang members. He had not previously patrolled at Stribley Park as part of the violent crime mission and was not aware if any other officers were assigned to the park as part of the mission.

At the park Talamantes saw three Hispanic teenage males—the minor, his cousin Jose A., and their friend Miguel H.—sitting on a park bench. All three were wearing an article of red clothing. Because red usually symbolizes Norteño gang membership and most Norteños in Stockton are Hispanic, Talamantes drove over to speak with the teenagers. He parked in front of them, facing against traffic, and talked with them while remaining in his patrol car. He did not activate his emergency lights, turn on his siren, draw his weapon or handcuffs, and did not have a partner with him. Through the patrol car window, he asked the teenagers what they were doing and they answered they were waiting for a ride and hanging out, " 'chillin'.' " Talamantes joked with them, " 'chillin' like a villain?' " He was smiling at the time and all three teenagers laughed in response. While in his car, he was at least 20 feet away from them.

Talamantes noticed the minor appeared nervous and was looking around, so Talamantes decided to talk to him further. For officer safety, he got out of the car and walked over to the teenagers. He kept about six feet of distance between himself and the

2

teenagers.  He did not inform the teenagers that they did not have to speak with him if they did not want to or that they were free to leave.  His initial conversation with them was "[j]ust regular conversation like, 'Hey, how are you guys doing?  What are you guys doing?' "  He spoke to them about Norteños and that they are often Mexican, as was he, and explained he knew what it was like to grow up in the area.  He asked the teenagers "simple questions like, . . . where they lived, if they were gang members, why they were wearing red," if they were Norteños, and if any of them had ever been arrested or were on parole or probation.  He asked what school they went to and shared that he had graduated from the same high school.  He also asked if they were "carrying any weapons or anything illegal on them."  They said they were not.  This conversation lasted about three or four minutes.  Talamantes was speaking to them in a friendly tone of voice, trying to be courteous and to make them feel as comfortable as possible.  During the entire conversation, Talamantes was joking around with the teenagers, "trying to get their confidence, like, trying to make them feel comfortable . . . joking with them.  They all smiled and were laughing when I was joking with them."

Talamantes asked the teens, " 'Do you mind if I pat you guys down?' "  All three answered they did not mind.  All three started patting themselves down.  Jose and Miguel started looking toward the minor and the minor became extremely nervous, bouncing his knees and looking around as though he was going to flee.  That nervous response to Talamantes' question about weapons made Talamantes fearful for his safety and concerned that the minor had a weapon.

Out of concern for his safety, Talamantes directed the minor to step off the bench, turn around, and place his hands behind his head.  As the minor turned and raised his hands, his sweater lifted and Talamantes saw something protruding from the minor's waistband.  Talamantes believed it was a wooden handle for either a pistol grip or a knife. He grabbed both of the minor's hands and patted him down.  He felt a hard, metallic, heavy object that he believed could be a weapon and pulled it out; it was a revolver.

3

Jose A. testified that Talamantes was out of the car before he asked them any questions, and his first question was, " 'Do you guys bang?' " to which the trio answered, " 'No.' " He then asked if they were Norteños. His hands were next to his baton, holding on to it, and he was speaking to them in a "deep tone" of voice. The way Talamantes was looking at them made Jose feel Talamantes was accusing them of something. Immediately after the teenagers answered, Talamantes told him he was going to search them. He told the minor to stand up and asked if he had any weapons on him. He then began searching the minor.

Miguel H. testified that as soon as Talamantes pulled up, he asked how they were doing, whether they were staying out of trouble, and whether they were gang members. They answered they were just " 'chillin',' " to which Talamantes responded, " 'Oh, you guys chillin' like a villain?' " The teenagers answered they were " 'just kicking it.' " Initially, Talamantes remained inside the patrol car, about 20 feet away from the teenagers. He had his hands on his baton when he got out of the car and put it back on his belt. His hands were resting on his duty belt, near his waistline. He stopped about 15 feet away from the teenagers. He was talking to the teenagers for about five minutes when he told the minor, " 'I'm going to have to search you.' " When he started searching, he asked if the teenagers had any weapons on them. Upon searching the minor, Talamantes found the gun. Then he put the minor on the ground, arrested him, and drew his weapon. During the conversation, Talamantes' tone was not angry or calm, more like curious. The questions about being a gang member made Miguel feel as though he was being accused of doing something wrong. Miguel testified Talamantes did not ask for permission to search the teenagers.

The minor testified that when he pulled up and approached them, Talamantes looked curious. The minor recalled the patrol car was parked approximately five to seven feet away from the teenagers. Talamantes did not ask any questions while still in the vehicle. He got out of the car and put the baton in its place on his belt and started asking

4

questions. During the questioning, Talamantes kept his hands near his hips, and near his weapons. At this point, Talamantes was about five to six feet away from the teenagers. Talamantes' first question was whether they were gang members. He then asked what they were doing and they told him they were just hanging out and having a good time. Although his friends and Talamantes were laughing when Talamantes said they were " 'chillin' like a villain,' " the minor was offended as he took it to mean Talamantes was implying they were "up to no good, a villain." Talamantes asked if they were Norteños because they were Mexican. They asked why he was asking them, and Talamantes responded, " 'Oh, because I'm Mexican myself, and usually every Mexican is like gang bangers.' " This made the minor feel as though the officer was trying to accuse him of something. Based on how Talamantes was behaving, and his asking questions about being a gang member, the minor did not feel he was free to leave. Talamantes then asked if they were on probation. The minor answered, " 'No.' " He felt like Talamantes was just doing his job but did not feel like he was free to leave. Talamantes then advised he was going to pat them down and said he was going to start with the minor. The minor did not feel as though he could refuse to be searched. He did not feel he had a choice whether to answer the questions. Talamantes questioned the teenagers for about five minutes before the search.

The juvenile court denied the motion to suppress, finding Talamantes approached the three teenagers and during the conversation remained five to six feet away from them, did not display his weapon, and did not touch the teenagers. The tone of the conversation was friendly, and the teenagers were not blocked from leaving by either the patrol car or the officer. The court found none of the questions asked by the officer "rose to the nature of being accusatory." The court also found "the ring of truth" when Talamantes testified he asked the minors if they minded if he patted them down and all three teenagers, including the minor, gave Talamantes permission to search them. Finding the encounter

5

remained consensual and the minor gave Talamantes permission to search him, the juvenile court denied the motion to suppress.

After the motion to suppress was denied, the court held a contested jurisdictional hearing. The juvenile court sustained the petition, finding the allegations that the minor possessed a firearm, possessed live ammunition, carried a loaded firearm, and committed a battery on school property true beyond a reasonable doubt. The court declared the minor a ward of the juvenile court, placed him on probation, and ordered him to serve 60 days in juvenile hall with credit for 29 days served. The juvenile court also ordered him to complete gang awareness and anger management classes.

## DISCUSSION

The minor contends the trial court erred in denying his motion to suppress. He claims that in deciding whether the encounter between Talamantes and the minor was a consensual encounter or a detention, the trial court did not consider the totality of the circumstances, and there were several additional factors tending to show a reasonable teenager under the circumstances would not have felt he had a choice to leave. Specifically, the minor argues the trial court did not consider that the encounter took place at a park "in a ghetto setting" that had recently been targeted by law enforcement as part of a " 'violent crime mission,' " and did not consider the age of the minors. The minor also contends the finding that he consented to the search is not supported by substantial evidence. We disagree.

"Police contacts with individuals may be placed into three broad categories ranging from the least to the most intrusive: consensual encounters that result in no restraint of liberty whatsoever; detentions, which are seizures of an individual that are strictly limited in duration, scope, and purpose; and formal arrests or comparable restraints on an individual's liberty. [Citations.] Our present inquiry concerns the distinction between consensual encounters and detentions. Consensual encounters do not

6

trigger Fourth Amendment scrutiny. [Citation.]." (*In re Manuel G.* (1997) 16 Cal.4th 805, 821 (*Manuel G.*).)

An officer's simply approaching an individual and asking a few questions does not constitute a detention and will not trigger Fourth Amendment scrutiny unless it loses its consensual nature. (*Florida v. Bostick* (1991) 501 U.S. 429, 434 [115 L.Ed.2d 389, 398] (*Bostick*).) An encounter remains consensual as long as a reasonable person would feel free " 'to disregard the police and go about his business.' " (*Id*. at p. 434 [115 L.Ed.2d at p. 398].) A consensual encounter transforms into a detention when the officer, by means of physical force or show of authority, in some manner restrains the individual's liberty. (*Ibid.*)

To determine whether a particular encounter constitutes a detention, courts must consider all the surrounding circumstances to ascertain whether the police conduct would have communicated to a reasonable person that he or she was not free to decline the officer's requests or to terminate the encounter. (*Bostick, supra*, 501 U.S. at p. 439 [115 L.Ed.2d at pp. 401-402].) This test assesses the coercive effect of the police conduct as a whole, rather than emphasizing particular details of that conduct in isolation. (*Michigan v. Chesternut* (1988) 486 U.S. 567, 573 [100 L.Ed.2d 565, 572].) Factors that might indicate an unlawful detention has taken place include (1) the presence of several police officers, (2) an officer's display of a weapon, (3) some physical touching of the person, or (4) the use of language or a tone of voice indicating that compliance with the officer's request might be compelled. (*United States v. Mendenhall* (1980) 446 U.S. 544, 554-555 [64 L.Ed.2d 497, 509]; *Manuel G.*, *supra*, 16 Cal.4th at p. 821.) The officer's uncommunicated state of mind and the individual citizen's subjective belief are irrelevant in assessing whether a seizure triggering Fourth Amendment scrutiny has occurred. (*In re Christopher B*. (1990) 219 Cal.App.3d 455, 460.)

In evaluating whether the contact between the minor and Talamantes was consensual or a detention, "we view the record in the light most favorable to the trial

court's ruling and defer to its findings of historical fact, whether express or implied, if they are supported by substantial evidence. We then decide for ourselves what legal principles are relevant, independently apply them to the historical facts, and determine as a matter of law whether there has been an unreasonable search and/or seizure." (*People v. Miranda* (1993) 17 Cal.App.4th 917, 922; accord, *People v. Glaser* (1995) 11 Cal.4th 354, 362.)

Initially we note, absent evidence to the contrary, "[t]he general rule is that a trial court is presumed to have been aware of and followed the applicable law. [Citations.]" (*People v. Mosley* (1997) 53 Cal.App.4th 489, 496.) Although the juvenile court did not explicitly note the location of the park or the minor's age in its statement of decision, a silent record is not an indication that a trial court failed to consider the relevant circumstances. The court expressly indicated it was applying the correct standard and was required to examine "all of the circumstances surrounding the encounter and whether police conduct communicated to the individuals that they were not free to leave." In this case, the applicable law includes consideration of the age of the teenagers and the location of the encounter. Nothing in this record suggests, let alone demonstrates, that the juvenile court failed to apply that standard.

"[T]he testimony of a single witness is sufficient for the proof of any fact." (*People v. Richardson* (2008) 43 Cal.4th 959, 1030-1031.) Talamantes testified he did not activate his lights or siren when he approached the teenagers. Upon exiting the patrol car, he placed his baton in his duty belt and during the encounter rested his hands near the belt, but he did not display or draw a weapon or handcuffs. No other officers participated in the conversation with the teenagers. The encounter took place in a public setting, and the teenagers were not directed to move to a different location.[1] During the conversation,

---

[1] Contrary to the minor's claim, it is not clear from the record that the park was the subject of the "proactively aggressive" assertion of officers' "collective and individual

8

Talamantes did not touch any of the teenagers, neither the patrol car nor his body was blocking them, and he remained five to six feet away from them. The encounter lasted only three to four minutes, and was conversational and friendly in tone. Eventually, Talamantes asked for permission to search the teenagers and they consented to be searched.

The teenagers gave a slightly different account, primarily in the characterization of the tone of the conversation and in denying they consented to being searched. In assessing whether the trial court's findings of historical fact are supported by substantial evidence, we do not resolve either credibility issues or evidentiary conflicts. The resolution of those conflicts and inconsistencies in the evidence is reserved exclusively to the trier of fact. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) If the circumstances reasonably justify the juvenile court's findings, we cannot reverse merely because the circumstances also might support a contrary finding. (*People v. Williams* (1971) 5 Cal.3d 211, 214.) Applying these standards, we find Talamantes' testimony furnished substantial evidence that the encounter was consensual and the minor consented to the search. (*Manuel G.*, *supra*, 16 Cal.4th at p. 823.)

## DISPOSITION

The judgment is affirmed.

                                                     RAYE            , P. J.

We concur:

        BLEASE        , J.

        BUTZ          , J.

---

authority" over the park. Talamantes had not patrolled there and was unsure whether any other officers had. Much of the minor's argument on this point rests on facts not found in the record. Accordingly, we do not consider them.