# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
September 3, 2014 Session

## STATE OF TENNESSEE v. TERRY NORRIS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 97-08293     James C. Beasley, Jr., Judge**

---

**No. W2000-00707-CCA-R3-CD  -  Filed November 18, 2014**

---

In this procedurally complex case, a Shelby County jury convicted the Defendant, Terry Norris, of second degree murder in 1999, and the trial court sentenced him to twenty-one years of incarceration. After several proceedings and filings, discussed in detail below, the U.S. Sixth Circuit granted the Defendant habeas corpus relief unless the State allowed the Defendant to reopen his original direct appeal and raise an issue regarding whether his confession should have been suppressed pursuant to *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991). The State allowed the Defendant to reopen his appeal. On appeal, the Defendant contends that the trial court erred when it denied his motion to suppress his confession to police because he gave his confession after being held for more than forty-eight hours without a probable cause hearing. After a thorough review of the record and the applicable authorities, we conclude that we must address the issue before us for plain error. After conducting our plain error review, we conclude that the Defendant is not entitled to relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ROGER A. PAGE and ROBERT L. HOLLOWAY, JR., JJ., joined.

Amy Rao Mohan, Nashville, Tennessee, and Kellen S. Dwyer, Washington, D.C. (on appeal); Michael Johnson and Garland Erguden, Memphis, Tennessee (at trial), for the appellant, Terry Norris.

Robert E. Cooper, Jr., Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; William L. Gibbons, District Attorney General; and Karen Cook, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts and Procedural History**

**A. Trial**

In July 1997, a Shelby County grand jury indicted the Defendant for one count of second degree murder. In our opinion denying the Defendant's first appeal, we summarized the facts presented as follows:

On March 10, 1997, nineteen-year-old victim Keith Milem was found shot to death outside the home where he lived with his uncle. On the evening of March 11, 1997, the Defendant was taken into custody by police and questioned about the crime. On March 13, 1997, the Defendant confessed to shooting the victim. The Defendant informed police of the location of the murder weapon, a nine-millimeter semiautomatic pistol, and police recovered the gun and submitted it for testing. Results of tests performed on the gun indicated that the fatal shots had indeed been fired from the Defendant's gun.

At trial, Lakendra Lavonne Mull testified that she and the Defendant were roommates at the time of the crime, and she reported that at that time, the Defendant was dating her cousin, Lateeska Newberry. Mull explained that the victim was also her distant cousin, and she stated that Newberry and the victim had known one another since attending elementary school together. Mull characterized the victim and Newberry as her "best friends."

Mull testified that on March 10, 1997, the victim, Newberry, and a third friend named Tim visited her apartment during the afternoon. Mull stated that the Defendant was present at their apartment when the victim initially arrived, and she reported that the Defendant spoke to the victim briefly upon the victim's arrival. Approximately two hours after the victim arrived at the apartment, the Defendant left and later returned with his brother. At the time the Defendant returned, the victim, Newberry, Tim and Mull were engaged in conversation, and the victim and Tim were drinking alcoholic beverages. Mull testified that the Defendant and his brother stayed only ten minutes upon their return to the apartment before departing a second time. Mull testified that the Defendant subsequently telephoned her to tell her that he had left his gun at the apartment, and he soon returned to pick up the gun. Mull explained that her young daughter lived with them, and the Defendant generally did not leave the

-2-

gun in the apartment with Mull's daughter. After picking up the gun, the Defendant left for a final time.

Mull recalled that approximately three hours after the Defendant picked up his gun, she drove the victim home. Mull testified that the victim was "kind of staggering because he had been drinking." However, she maintained that the victim "probably was more sleepy than full of alcohol" because he had not drunk "all that much" while at her apartment. Mull recalled that when she left her apartment at approximately 9:55 p.m., she saw the Defendant parked across the street from their apartments in his "burgundy or maroon" 1993 Grand Am. She stated that when she pulled out of the apartment complex, she saw the Defendant begin to follow her car without his lights on, and she testified that the Defendant followed her car to the victim's home, a drive which Mull testified took three to four minutes. Mull reported that after she dropped the victim off in front of his home and turned her car around, the Defendant flashed his "high beams" at her car. Mull stated that she last saw the victim standing at the door to his home as she drove away.

Mull reported that the Defendant did not return home on the night of the murder, but she stated that the Defendant called her once that night. She recalled that at approximately 6:00 a.m. the following morning, the Defendant returned to their apartment to pick up clothes.

Mull testified that the Defendant normally carries a gun. Mull further testified that approximately a week prior to the homicide, she saw the Defendant put mercury covered with candle wax on the tips of bullets. When she asked him what he was doing, the Defendant explained that the mercury "makes the bullet explode when it enters something."

On cross-examination, Mull acknowledged that she told police she believed the Defendant thought that his girlfriend, Lateeska Newberry, was in her car on the night of the murder. She explained to police that she thought the Defendant was jealous after seeing the victim and Newberry together at her apartment earlier in the evening. She stated that she had known the Defendant to be jealous "[o]ver [Newberry]." However, she stated that while the victim was at her apartment on the day of the murder, the victim and Newberry were not affectionate and were "sitting across the room from each other."

Charles Edward Milem, the victim's uncle, testified that the victim was living with him at the time of his death. Milem testified that he was in his

bedroom when the victim was shot. Milem recalled that from his bedroom window, he saw the victim get out of Mull's car and walk to the front porch of their home. As Mull's car pulled away, Milem saw another car immediately pull up on "the wrong side of the street." Milem next heard the victim ring the doorbell, and he then heard voices calling the victim. Milem testified, "One voice said, hey. My nephew repeated, who [sic] there, who [sic] there. And another voice immediately said, come here." Following this, Milem heard three gunshots, which he claimed came from the car that had pulled up after the victim was dropped off. At this point, he could no longer see the victim standing in the street. Milem rushed to the door, saw the victim lying in the street, and saw a car pull away. Milem stated that the car from which the shots were fired "looked white up under the street lights" and "sound[ed] like a Cutlass." When Milem approached the victim, he noticed that the victim's hands were still in his pockets.

Byron Braxton of the Memphis Police Department testified that he was called to the crime scene on March 10, 1997. He recalled that when he arrived at the scene, paramedics were already there. Braxton testified that he saw the victim lying face-down in the middle of the street, and when the paramedics rolled him over, Braxton saw that the victim's hands were still in his pockets. He stated, "[T]he shooter wasn't there to our knowledge. The consensus of the witnesses were that they saw a white box-type Chevy headed toward [a nearby street]. It was occupied by two to three male blacks. But they really couldn't give a description on the individual." Officers recovered three nine-millimeter shell casings from the scene. They also found a bullet lodged in the door of a house near the home in which the victim lived.

The State introduced the Defendant's March 13, 1997 statement through the testimony of Memphis Police Sergeant Dwight Woods. Woods participated in taking the Defendant's statement, which includ[ed] the following:

Q.     Terry, do you know Keith Milem?
A.     Yes.

Q.     Are you aware that Keith Milem was shot and killed on Monday, March 10, 1997 at approximately 10:00 PM in front of 610 Loraine Drive?
A.     Yes.

Q. Did you shoot Keith Milem?
A. Yes.

Q. What did you shoot Keith Milem with?
A. A Smith and Wesson 9mm Automatic.

Q. How many times did you shoot Keith Milem?
A. I don't know.

Q. Why did you shoot Keith Milem?
A. Because he attacked me and hit me in the face and grabbed my arm.

Q. Terry, tell me in your own words exactly what occurred before, during and after the shooting?
A. Well from a couple of days before the shooting I heard my roommate Kim and my girlfriend Ranata talking about their cousin Keith or "Black" which is what they called him and I was suspicious about him the whole time and the day of the shooting he came to my home at 1104 Craft Road #1 (Southern Hills Apartments). I came home at about 9:00 that evening and saw him and my girlfriend talking. He was on the couch and she was on the love seat directly in front of him talking. So, I left[,] . . . thinking that they may be having a relationship, I was mad.

I left my apartment and when I returned I saw my roommates [sic] car leaving the apartments and I thought my girlfriend was in the car also so I followed them to talk to my girlfriend but when they got to Keith's house Ranata was not in the car so I stopped to talk to Keith. I called Keith to the car and asked him what was up and he asked what was I talking about and I asked was him and Ranata in a relationship and he told me that it wasn't my business so I told him that it was my business and it seems as if he saw my gun on the seat and looking at the gun, he hit me on the left side of my face and like dove into the car. I grabbed my gun, he grabbed my arm and I snatched away from him and pointed my gun at him and

-5-

pulled the trigger. When I saw him fall, I took off. After I left I went to the Kings Gate Apartments and got into a fight with a young man and then I went to Orange Mound where I hid my gun in [an] abandoned apartment building on Arbra.

Q. Terry, when you were following Kim and Keith, did you have your lights on or off?
A. I had my lights on but I turned them off when we got to the corner of Tulane and Shelby Drive to see who was in the car but I could not.

Q. Terry, what direction did you leave after you shot Keith?
A. East on Loraine towards Tulane, I turned left and went north on Tulane to Shelby Drive. Turned right on Shelby Drive and went east.

Q. Terry, describe your car that you drive?
A. I drive a burgundy Pontiac Grand AM, 1993, 2-door SE.

Q. Terry, does your car have fog lights on it?
A. Yes sir, it has white fog lights.

Q. Terry, do you know if Keith was drinking or drunk?
A. Yes. He was drinking a gallon of wine with a friend in my home when I left. When I left and came back, he was still drinking some of the wine a while later.

Q. Terry, were you drinking or using any type [of] drugs?
A. No sir.

Q. Terry, did you recently put the mercury out of a thermometer into the end of the bullets that were in your gun and cover the ends with candle wax?
A. Yes sir[,] . . . I did that but not recently. It was when I first moved in to [sic] the apartment.

Q. Terry, when you first encountered Keith, was it your intention to shoot him?
A. No.

-6-

Q. Terry, is there anything else you can add to this statement that would aid in this investigation?

A. Yes sir, I'm sorry for what happened. I wish I could take it back.

Q. Did you give this statement of your own free will without any promises, threats or coercion?

A. Yes.

Q. Were you advised of your rights before you gave this statement?

A. Yes.

The Defendant testified on his own behalf at trial. He claimed that on one of the occasions while he was away from his apartment on the afternoon prior to the murder, he received a page from his girlfriend, who was at his apartment with Mull and the victim. The Defendant stated that as he drove back to his apartment in response to the page, he passed Mull's car on the road. He testified that he believed his girlfriend was in the car with Mull, and he therefore "blinked" his lights at Mull's car. The Defendant maintained that when Mull didn't stop, he blew his horn and flashed his lights a second time. He then followed her. The Defendant maintained that he turned off his lights in order to see who was in Mull's car. He explained, "I couldn't see because her car . . . had been in an accident. It was real . . . crushed up on one side, and I couldn't see in it." The Defendant stated that he followed Mull's car, continuing to try to get her attention, but eventually lost the car after he turned around.

The Defendant testified that after losing sight of Mull's car, he saw the victim standing in the yard of his uncle's home. The Defendant recalled that he "called [the victim] over" to his car. When the victim approached, according to the Defendant, the two men engaged in an argument about the Defendant's girlfriend. The Defendant described the victim as angry and stated that the victim's speech was slurred. The Defendant maintained that during the argument, the victim hit him, and he tried to "fend [the victim] off." The Defendant claimed that the victim then "dove in[to]" his car, while still hitting the Defendant, and attempted to grab the Defendant's gun, which was in plain view. According to the Defendant, he tried to push the victim out of

the car, and as he pushed the victim away, he raised his gun and shot the victim.

The Defendant admitted that at the time he shot the victim, he was "enraged." The Defendant also admitted that on the night of the murder, he was "suspic[ious]" that the victim and Newberry, his girlfriend, were starting a relationship. He testified that on the day of the shooting, he and Newberry were in "a fight" and were not really speaking. The Defendant recalled that he was "upset at [his] girlfriend."

The Defendant testified that on the day of the shooting, he retrieved his gun from the apartment that he shared with Mull because of Mull's "under-age daughter and just for safety reasons." He admitted to putting mercury on the tips of bullets, stating that "if [the mercury] got into a person . . . it would make the wound more severe." However, the Defendant maintained that he altered his bullets solely "for protection."

A videotaped deposition of Dr. O.C. Smith, an assistant medical examiner for Shelby County and Deputy Chief Medical Examiner for western Tennessee, was admitted into evidence. In his deposition, Smith stated that he performed the autopsy on the victim in this case. He stated that the victim died of multiple gunshot wounds. Smith specified that three bullets entered the Defendant's body, two of which exited the victim's body. Smith stated that one of the bullets which entered the victim's body severed the victim's spinal cord, rendering him incapacitated with "no voluntary control over his extremities."

Dr. Smith retrieved a "plastic property material" from the interior of one of the victim's bullet wounds that he concluded was "consistent with candle-wax." Smith explained that "some people will [put candle wax on the tip of a bullet] to cause a bullet to behave more like a full-metal jacket." He stated that a "full-metal jacket" is a bullet "that does not deform or fragment, and therefore . . . does not cause increase[d] suffering." He further explained that "[t]here's a concept out in the community, especially in the media industry, that if a hollow-point bullet is filled with metallic liquid mercury and that liquid mercury would be held in place by some devise [sic], that if that bullet contacts the body at high speed it will cause an almost explosive effect on the tissue."

Smith also noted a "pre-death" injury to the victim's "ring finger on his left hand that is a[n] evulsive type or a tearing type of laceration that peeled the skin down towards the finger-tip." He explained that "something snagged the skin with sufficient force to peel the skin down." Smith further noted "what is known in layman's terms . . . as powder burns, or a stipple type pattern on the inside of [the victim's] left wrist." Smith stated that "stipple will mark the skin out to about twenty-four inches, for most handguns." Finally, Smith noted an injury on the back of the victim's head comprised of "a large area of bruising[,] . . . some skin scraping and . . . some skin tearing." He explained, "It's an injury due to contact with a broad, blunt object. Certainly a fall to the ground can cause something like that."

*State v. Terry Norris*, No. W2000-00707-CCA-R3-CD, 2002 WL 1042184, at *1-6 (Tenn. Crim. App., at Jackson, May 21, 2002), *perm. app. denied* (Tenn. Nov. 4, 2002).

Following a trial, the jury convicted the Defendant of second degree murder, and the trial court sentenced him to twenty-one years in the Tennessee Department of Correction. *Id.* at *1.

The Defendant appealed his conviction to this Court. *Id.* He contended that: (1) his counsel were ineffective for failing to move for suppression of the Defendant's confession based upon a violation of his Fourth Amendment rights; and (2) his counsel were ineffective for arguing a defense theory to the jury that was inconsistent with both the Defendant's wishes and testimony. *Id.* We concluded that the Defendant's confession was not obtained in violation of his Fourth Amendment rights and, thus, that his counsel were not ineffective for failing to file a motion to suppress his statement based on the delay between the time of his arrest and the judicial determination of probable cause. *Id.* We further concluded that any error by defense counsel concerning the choice of defense strategy did not result in prejudice to the Defendant. *Id.* We therefore affirmed the judgment of the trial court. *Id.*

The Defendant appealed this Court's holding to the Tennessee Supreme Court. *Id.* The Tennessee Supreme Court denied his request for permission to appeal. *Id.*

**B. Petition for Post-Conviction Relief**

The Defendant filed a *pro se* petition for post-conviction relief, followed by an amended petition after the appointment of counsel and a supplement to the amended petition. The Defendant alleged that appellate counsel was ineffective for not correctly stating his issue pursuant to *State v. Huddleston*, 924 S.W.2d 666 (Tenn. 1996). In *Huddleston*, our Supreme Court held that a judicial determination of probable cause must occur within

forty-eight hours of a warrantless arrest to protect a defendant's Fourth Amendment rights. 924 S.W.2d at 672 (adopting *McLaughlin*, 500 U.S. 44). A confession obtained in violation of this forty-eight-hour time line is subject to being excluded under a "fruit of the poisonous tree" analysis. *Id.* at 674.

This Court summarized the facts presented at the petition for post-conviction relief hearing as follows:

### [Defendant's] Proof

At the [Defendant's] evidentiary hearing, Lieutenant A.J. Christian of the Brighton Police Department testified that in 1997 he was a detective with the Memphis Police Department's Homicide Bureau involved in the [Defendant's] case. Christian said that the [Defendant's] arrest report showed that he was in police custody at the homicide office on March 11, 1997, at 7:30 p.m. He could not recall the exact time that the [Defendant] was taken into custody and explained that the arrest ticket would have the actual time and that the arrest narrative report "was just a supplement documenting the course of action that was taken after he was taken into custody."

Marcia Daniel, the [Defendant's] mother, testified that on March 11, 1997, police officers "called between 4:30 [p.m.] and five looking for [the Defendant]." Daniel located the [Defendant] and said he arrived home "between five and 5:15 [p.m.]." The police, who had arrived at the residence "maybe three to five minutes" before the [Defendant], left with him "approximately about 5:45" p.m. Daniel testified that she told trial counsel, but not appellate counsel, of these events. Daniel acknowledged that the [Defendant] called her on March 13, 1997, and that, although she could not recall the time of the phone call, he told her he had agreed to talk to the police but wanted to talk with her first.

Trial counsel testified that during his representation of the [Defendant], he believed he had "open-file discovery" from the State. Asked if he was aware that the [Defendant] was in police custody at 7:30 p.m. on March 11, 1997, trial counsel stated "that either [he] was aware or [he] should have been aware. [He], frankly, [did not] remember if anything was on the arrest ticket or not." Trial counsel said that at the time he argued the [Defendant's] motion to suppress his statement to police, he was aware of the "[t]he 48 hour rule" announced in *Huddleston* but acknowledged he "failed to raise that issue." Trial counsel also acknowledged that he did not object to the definition of

"knowingly" in the jury instructions. On cross-examination, trial counsel testified that prior to the [Defendant] giving his statement on March 13, 1997, he was presented with "an advice of rights form" at 4:05 p.m. and signed it at 4:12 p.m.

The [Defendant] testified that he told appellate counsel that he was arrested at his mother's house on March 11, 1997, "[b]efore 7 p.m." and that more than forty-eight hours passed before he gave his statement to police on March 13, 1997. He acknowledged that the advice of rights form showed that he was given the form at 4:05 p.m. and that he signed it at 4:12 p.m. on March 13, but said he did not put the time on it and could not recall exactly what time he signed it, only remembering "[it] was after the evening meal in the jail." The [Defendant] also acknowledged signing his police statement at 8:20 p.m. and said that he actually gave the statement verbally before this time.

On cross-examination, the [Defendant] acknowledged that he was not in custody at 4:05 p.m. on March 11, 1997. He testified that the police initially came to his mother's house that day at 6:05 p.m., but left because he was not at home, and then returned "[s]omewhere around" 7:00 p.m. to question him. He acknowledged that he agreed to talk to the police on March 13, 1997, in exchange for being allowed to talk to his mother, stating that he was able to reach her at 6:50 p.m.

**State's Proof**

Appellate counsel testified that he represented the [Defendant] on his motion for a new trial and on appeal. Discussing the [Defendant's] *Huddleston* claim, which he raised in the [Defendant's] motion for a new trial and on appeal, appellate counsel said he focused on the fact that the [Defendant's] confession "was clearly illegal" because "from the record [the police] didn't have probable cause to arrest [the Defendant] in the first place." Asked if he thought the amount of time the [Defendant] was in custody prior to giving his confession was a valid issue to pursue, appellate counsel answered that he "apparently" did not because he did not raise it on appeal. As for the jury instructions defining "knowingly," appellate counsel stated that "there's no question that there was an error in the jury instructions, but [he did not] think there was any question that it was harmless error" and, therefore, did not raise it in the motion for a new trial or on appeal.

-11-

*Terry Jamar Norris v. State*, No. W2005-01502-CCA-R3-PC, 2006 WL 2069432, at *5-6 (Tenn. Crim. App., at Jackson, July 6, 2006), *Tenn. R. App. P. 11 application denied* (Tenn. Dec. 18, 2006).

Addressing the issues, this Court affirmed the post-conviction court's dismissal of the Defendant's petition for post-conviction relief. Concerning the *Huddleston* issue, we stated:

> The [Defendant] argues that "appellate counsel was ineffective for failing to show at [his] motion for new trial hearing that [his confession] was given more than 48 hours after his arrest in violation of *State v. Huddleston*." However, in the [Defendant's] direct appeal, this Court determined there was no *Huddleston* violation.

*Id*. at *8. The Court went on to quote from our decision in the Defendant's direct appeal. *Id*. at *8-9. The Court then noted that the post-conviction court, in its order dismissing the petition for post-conviction relief, found the Defendant's *Huddleston* argument to be without merit. *Id*. at *9. We quoted the post-conviction court's findings:

> Although the *Huddleston* issue was addressed on direct appeal, the Court will quickly address the issue in regard to the ineffective assistance of counsel claim against Appellate Counsel. [The Defendant] asserts that his statement should be excluded as "fruit of the poisonous tree" because it was given after forty-eight (48) hours of detention with no probable cause determination. However, the testimony does not support the claim. The [Defendant] signed an Advice of Rights form at 4:12 P.M. on March 13, 1997. The testimony of [the Defendant's] mother indicated the police left her home around 5:45 P.M. on March 11, 1997. The [Defendant] admitted that he was not in custody at 4:05 P.M. on March 11, 1997; and also admitted he agreed to talk with police around 4:05 P.M. on March 13, 1997. The [Defendant] stated that he agreed to speak with police in order to get a phone call to his mother. His testimony further indicated that he then tried to contact his mother but was unable to reach her until about 6:50 P.M. on March 13, 1997. The Police stuck to their word and waited until the [Defendant] was able to speak to his mother before taking his statement. The [Defendant] cannot claim the time period was over forty-eight (48) hours when it was due to his desire to speak with his mother before making his statement.

*Id*. Our Court went on to hold:

We agree with the post-conviction court that this issue is without merit. Although the [Defendant] contends that his direct appeal would have turned out differently had appellate counsel showed that he was in custody more than forty-eight hours at the time he gave his statement to police, he has failed to meet his burden of showing that he actually was in custody more than forty-eight hours prior to giving his confession at 7:20 p.m. on March 13, 1997. On direct appeal, this court found the [Defendant] was arrested at 8:45 p.m. on March 11, 1997. At the post-conviction hearing, there was only conflicting testimony offered as to when the [Defendant] was taken into custody, but no records were entered into evidence to show that this court erred when, on direct appeal, it concluded that the [Defendant] was arrested on March 11, 1997, at 8:45 p.m. Accordingly, the record supports the determination of the post-conviction court that this claim is without merit.

*Id.*

## C. Habeas Corpus Petitions

On February 23, 2007, the Defendant filed a *pro se* petition for a writ of habeas corpus in the Circuit Court of Lauderdale County, alleging that his conviction was void because at the time he was sentenced, Tennessee Code Annotated section 40-35-209(e) did not provide for 100% sentencing as a violent offender. On February 26, 2007, the habeas corpus court summarily dismissed the petition, finding that there was nothing on the face of the judgment to show that the Defendant's conviction was void or that his sentence had expired. The habeas corpus court noted that Tennessee Code Annotated section 40-35-501, in effect at the time of the Defendant's sentencing, mandated a 100% release eligibility date for a conviction for second degree murder. The Defendant then filed an appeal to this Court, and we affirmed the habeas corpus court's judgment. *Terry Jamar Norris v. Tony Parker, Warden*, No. W2007-00594-CCA-R3-HC, 2007 WL 4245730, at *1 (Tenn. Crim. App., at Jackson, Dec. 3, 2007).

On December 10, 2007, the Defendant filed a *pro se* habeas corpus petition under 28 U.S.C. § 2254 in the United States District Court for the Western District of Tennessee. *Terry Jamar Norris v. Jerry Lester, Warden*, 545 F. App'x 320, 323 (6th Cir. 2013). As relevant to the appeal before us, the Defendant contended that his appellate counsel was ineffective because he failed to effectively argue that his confession should be suppressed because he gave it after being held for more than forty-eight hours without a probable-cause determination, in violation of the forty-eight-hour rule in *McLaughlin. Id.* The district court found that all of these claims lacked merit and denied a certificate of appealability (COA). Regarding the Defendant's *McLaughlin* claim, the district court said "Norris . . . cannot

overcome his failure to demonstrate that he was actually in custody more than forty-eight hours before giving his confession."

The United States Court of Appeals for the Sixth Circuit granted the Defendant's COA on two issues, only one of which is relevant here: whether the Defendant's appellate counsel was ineffective for inadequately presenting a challenge to the Defendant's confession based on *McLaughlin*. *Id.*

The Sixth Circuit held:

> [The Defendant] contends that (1) his appellate counsel was deficient for failing to argue on direct appeal that [the Defendant's] right to a prompt probable-cause determination was violated under *McLaughlin*; and (2) that there is a reasonable probability that [the Defendant] would have prevailed on direct appeal had the *McLaughlin* issue been raised.

> In *McLaughlin*, the Supreme Court explained the circumstances in which a proper warrantless arrest can lead to a Fourth Amendment violation if a probable-cause determination is not held promptly. 500 U.S. at 47, 111 S.Ct. 1661. The Court created a burden-shifting standard that sought to balance the constitutional right to a prompt probable-cause determination with the "reasonable postponement" and "inevitable" delays that could result from "paperwork and logistical problems," especially in jurisdictions where probable-cause determinations are combined with other pretrial procedures. *See id.* at 55, 111 S.Ct. 1661. If a probable-cause determination occurred within 48 hours of arrest, the burden is on the arrestee to demonstrate that the probable-cause determination was "delayed unreasonably." *Id.* at 56-57, 111 S.Ct. 1661. Delays "for the purpose of gathering additional evidence to justify the arrest," as well as delays "for delay's sake" were given as examples of unreasonable delay. *Id.* at 56, 111 S.Ct. 1661. However, where more than 48 hours elapsed between arrest and probable-cause determination, the burden of proof lies with the prosecutor, who must demonstrate "the existence of a bona fide emergency or other extraordinary circumstance" beyond the ordinary logistics involved in combined proceedings. *Id.* at 57, 111 S.Ct. 1661.

> In *State v. Huddleston*, 924 S.W.2d 666 (Tenn. 1996), the Tennessee Supreme Court held that "the exclusionary rule should apply when a police officer fails to bring an arrestee before a magistrate [for a probable cause determination] within the time allowed by *McLaughlin*." *Huddleston*, 924 S.W.2d at 673. The *Huddleston* court held that the "fruit of the poisonous

tree" analysis should determine whether to suppress statements made during a detention that violates *McLaughlin*. *Id*. at 674 (citations omitted). Where the state courts refer to a "*Huddleston* violation," they are referring by implication to a *McLaughlin* violation.

[The Defendant's] appellate counsel alerted the court to the existence of *McLaughlin* on direct appeal, but did not present a *McLaughlin* challenge to [the Defendant's] confession. Without citing *McLaughlin*, the opening appellate brief argued that [the Defendant's] confession must be suppressed under *Huddleston* (which merely applies *McLaughlin*) and focused primarily on subjective intent as one would for a *McLaughlin* claim. In his reply brief, appellate counsel discussed *McLaughlin* and the 48-hour presumption directly, but then stated that [the Defendant] complained of a *Brown* violation. Certainly appellate counsel did not argue that [the Defendant] had been held for over 48 hours without a probable cause determination, nor did he dissect the record to demonstrate this, as would have been necessary to any *McLaughlin* challenge.

On direct appeal, the TCCA sua sponte dismissed the possibility of a *McLaughlin* claim on the grounds that [the Defendant] was held less than 48 hours, *State v. Norris*, 2002 WL 1042184 at *9, a conclusion based on an arrest time of 8:45 p.m. on March 11, when Norris was booked into jail, *see id*. at *7. At [the Defendant's] post-conviction appeal, the TCCA stood by that arrest time because it concluded that, even after a post-conviction evidentiary hearing, "there was only conflicting testimony offered as to when the petitioner was taken into custody." *See Norris v. State*, 2006 WL 2069432 at *9. Thus, the TCCA resolved this ineffective-assistance claim entirely on the merits of the underlying alleged *McLaughlin* violation, specifically on the 48-hour calculation.

Treating the 8:45 p.m. booking time as the arrest time was contrary to clearly established federal law. Even if there is no formal arrest, a person is considered seized for Fourth Amendment purposes when, under the circumstances, a reasonable person would not believe himself free to leave. *See Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988). It is undisputed that [the Defendant] was transported in handcuffs from his mother's home to the police station. Officer Christian testified that, at the time [the Defendant] was put into the squad car, he was "taken into custody" and confirmed that [the Defendant] was not free to leave. Officer McCommon testified that he and Officer Christian went "[t]o pick [the

Defendant] up at his home and bring him in for a statement." Under these circumstances, a reasonable person would not feel free to "decline the officers' request[]." *See Florida v. Bostick*, 501 U.S. 429, 436, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). Accordingly,[the Defendant] was arrested when "taken into custody" by Officers Christian and McCommon.

However, the TCCA's conclusion does not rely solely on the 8:45 p.m. arrest time, but also notes that testimony conflicted as to when [the Defendant] was taken into custody. Even resolving all testimony conflicts in favor of the government, it was an unreasonable determination of fact to find that [the Defendant] was in custody for less than 48 hours at the time he began to confess. Even if we discount entirely the testimonies of [the Defendant] and Daniels favoring an earlier time of arrest, it is undisputed that [the Defendant] was already at the police station at 7:30 p.m. on March 11 and had begun talking with Sergeant Christian. To find that [the Defendant] was in custody for less than 48 hours before confessing would require one to believe that [the Defendant] was free to go at 7:20 p.m. on March 11, and that police took less than ten minutes to tell him he was being taken into custody, handcuff him, place him in the back of the cruiser, drive him five-and-a-quarter miles, bring him into the police station, and begin their interview. This is simply implausible. Notwithstanding the conflicts in testimony, the state court's determination that [the Defendant] was in custody for less than 48 hours prior to confessing was an unreasonable determination of fact.

Although [the Defendant's] attorney was deficient in failing to focus on the precise length of [the Defendant's] detention and such an argument had a reasonable probability of persuading the state court that [the Defendant] had been in custody for over 48 hours prior to giving his statement on March 13, that fact alone is not enough to prove prejudice. Even if the state court had concluded that there were more than 48 hours of detention prior to confession, under *Huddleston*, Tennessee courts must find that the confession was "fruit of the poisonous tree" in order to suppress it. 924 S.W.2d at 674-75. The court would have had to consider four factors: "(1) the presence or absence of Miranda warnings; (2) the temporal proximity of the arrest and the confession; (3) the presence of intervening circumstances; and finally, of particular significance, (4) the purpose and flagrancy of the official misconduct." *See id*. Quoting *McLaughlin*, 500 U.S. at 56, 111 S.Ct. 1661, the *Huddleston* court held that "delay 'for the purpose of gathering additional evidence to justify the arrest'" supports a finding of purposeful police misconduct. *Id.* at 676.

-16-

There is evidence in the record suggesting that officers kept [the Defendant] detained to gather additional evidence. Captain Logan testified:

> [Logan:] Based on [the statements of Lakendra Mull and Charles Milem] we decided that [the Defendant] was a good suspect for this homicide.
>
> [The Defendant's Attorney:] . . . but did you have probable cause to charge him?
>
> [Logan:] Well, after picking him up and getting him in the office and talking to him, he admitted to it.
>
>     . . . .
>
> [The Defendant's Attorney:] You had strong suspicions, and you held him to do further investigation; is that correct?
>
> [Logan:] Yes, we did.

Furthermore, the record contains no alternative explanation for [the Defendant's] prolonged detention. *See McLaughlin*, 500 U.S. at 57, 111 S.Ct. 1661 (listing examples of appropriate reasons for delay: "transporting arrested persons from one facility to another, handling late-night bookings . . ., obtaining the presence of an arresting officer who may be busy processing other suspects or securing the premises of an arrest"). Since purpose is the most important of the four factors and the burden of proof would have been on the government instead of [the Defendant], there is a reasonable probability that the confession would have been suppressed if [the Defendant's] appellate counsel had raised the *McLaughlin* issue in a reasonably competent manner and persuaded the court on direct appeal that [the Defendant's] pre-confession detention was longer than 48 hours.

        . . . .

Accordingly, we grant the petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254(d), unless the [the State] reopens [the Defendant's] appeal within 180 days to allow him to raise the *McLaughlin* issue on direct appeal.

*Norris*, 545 F. App'x at 326-69.

-17-

After the Sixth Circuit's judgment, the State reopened the Defendant's appeal to allow him to raise the *McLaughlin* issue. That is the issue currently before this Court.

## II. Analysis

On appeal, the Defendant contends that the violation of his *McLaughlin* rights requires that his confession be suppressed. He asserts that the Memphis Police violated the Defendant's right to a prompt probable cause hearing as required by *McLaughlin*. He notes that the police arrested him without a warrant and confined him to jail for three nights before taking him to a magistrate for a probable cause determination. Further, as the Sixth Circuit noted, the record contains no alternative explanation for the Defendant's prolonged detention besides the police's desire to gather additional evidence.

The State responds by first contending that our review of this issue is limited to plain error because the Defendant did not raise this issue during his suppression hearing and only did so during his motion for new trial by indirectly addressing it as an ineffective assistance of counsel claim. The State asserts that the Defendant cannot show that the trial court committed plain error when it admitted the confession.

### A. Plain Error

As the State points out, this Court has stated: "[A] party is bound by the grounds asserted when making an objection. The party cannot assert a new or different theory to support the objection in the motion for a new trial or in the appellate court."[1] *State v. Adkisson*, 899 S.W.2d 626, 634-635 (Tenn. Crim. App. 1994); *see State v. Aucoin*, 756 S.W.2d 705, 715 (Tenn. Crim. App. 1988) (holding that an appellant cannot object on one ground and assert a new basis on appeal); *see also State v. David Dwayne Smith*, No. E2007-00084-CCA-R3-CD, 2009 WL 230696, at *21 (Tenn. Crim. App., at Knoxville, Feb. 2,

---

[1]In *Adkisson*, this Court stated:

> When, as here, a party abandons the ground asserted when the objection was made and asserts completely different grounds in the motion for a new trial and in this Court, the party waives the issue. *State v. Matthews*, 805 S.W.2d at 781; *State v. Aucoin*, 756 S.W.2d at 715; *State v. Dobbins*, 754 S.W.2d at 641; *State v. Davis*, 751 S.W.2d at 171; State v. Brock, 678 S.W.2d at 490. This theory finds its origin in three well-established rules. First, as a general rule, a party will not be permitted to assert an issue for the first time in the appellate court. Second, an appellate court will limit its decision to the ground asserted when the trial court made its ruling. Third, an appellate court will not permit a party to take advantage of its adversary when it is too late to remedy the basis of the objection.

*Adkisson*, 899 S.W.2d at 635.

2009), *Tenn. R. App. P. 11 application denied* (Tenn. Aug. 17, 2009). When that happens, the party waives the issue. *See Adkisson*, 899 S.W.2d at 635; *State v. Matthews*, 805 S.W.2d 776, 781 (Tenn. Crim. App. 1990); *Aucoin*, 756 S.W.2d at 715; *State v. Dobbins*, 754 S.W.2d 637, 641 (Tenn. Crim. App. 1988); *State v. Brock*, 678 S.W.2d 486, 490 (Tenn. Crim. App. 1984). We may still review the issue for plain error. *Adkisson*, 899 S.W.2d at 634-635.

In *Adkisson*, as in this case, the action challenged on appeal was the admission of evidence. To challenge such a ruling on appeal, the appellant is required by rule not only to enter a contemporaneous objection, but also to state the "specific ground of objection if the specific ground was not apparent from the context." *See* Tenn. R. Evid. 103(a)(1). The Defendant in this case did not allege a *McLaughlin* or *Huddleston* issue in his motion to suppress or at the motion to suppress hearing. Instead he raised two issues in his motion to suppress: (1) that the police were aware that he was an epileptic and willfully withheld his medication until he gave a statement to the police; and (2) that he refused to sign a waiver of rights thereby exercising his right to remain silent and further that he asked to speak with an attorney. Because the Defendant did not object in his motion to suppress on the grounds of *Huddleston* or *McLaughlin*, he has waived this issue, and our review is limited to plain error review. *See Adkisson*, 899 S.W.2d at 634.

We may review issues normally considered waived pursuant to the plain error doctrine. Tenn. R. App. P. 36(b). The doctrine of plain error only applies when all five of the following factors have been established:

(1) the record clearly establishes what occurred in the trial court;

(2) the error breached a clear and unequivocal rule of law;

(3) the error adversely affected a substantial right of the complaining party;

(4) the error was not waived for tactical reasons; and

(5) substantial justice is at stake; that is, the error was so significant that it "probably changed the outcome of the trial."

*State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010) (quoting *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000)). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *State v. Page*, 184 S.W.3d 223, 231 (Tenn. 2006).

## B. Clear and Unequivocal Rule of Law

The Defendant asserts that his confession was given after he was illegally detained for more than forty-eight hours. He notes, among other things, that Captain Logan admitted that the Defendant "refused to talk" when he was arrested and that he held him for "further investigation." He points to Captain Logan's response that he held the Defendant for further investigation and interrogation because "we had that right." The Defendant avers that this reflects a misunderstanding of *McLaughlin*, which allows for a reasonable postponement of a probable cause determination while police cope with everyday problems of processing suspects but does not give police the "right" to arrest suspects without a warrant and interrogate them for forty-eight hours before beginning the process of taking the suspect before a magistrate.

The State counters that the Defendant cannot prove that there has been a violation of a clear and unequivocal rule of law because, first, the Sixth Circuit improperly found that the Defendant was detained for more than forty-eight hours. The State asserts that, "Though there is some ambiguity in the trial-court record, the record fairly indicates that the confession occurred within 48 hours of the [D]efendant's arrest." The State points out that both Sergeant McCommon and the Defendant testified that the Defendant made an oral confession to police *before* he spoke with his mother on the telephone. The State next asserts that the Defendant's argument that the police held him for an improper purpose fails because (1) he has not shown a *Huddleston* violation and (2) he has not shown that consideration of the error is necessary to do substantial justice because the record shows that the police continued to investigate the crime while the Defendant was detained but not that they detained him so that they could get further evidence to justify the Defendant's arrest.

We begin with the proposition that "[b]oth the state and federal constitutions protect against unreasonable searches and seizures; the general rule is that a warrantless search or seizure is presumed unreasonable and any evidence discovered is subject to suppression." *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012). Our Supreme Court has recognized three categories of police interactions with private citizens: "(1) a full-scale arrest, which requires probable cause; (2) a brief investigatory detention, requiring reasonable suspicion of wrongdoing; and (3) a brief police-citizen encounter, requiring no objective justification." *Id*. (citing *State v. Daniel*, 12 S.W.3d 420, 424 (Tenn. 2000)).

The law requires that, when a person is arrested without a warrant, he or she must be brought "before a magistrate to 'seek a prompt judicial determination of probable cause.'" *Bishop*, 431 S.W.3d 22, 42 (Tenn. 2014) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 125 (1975) (holding that "the Fourth Amendment requires a timely judicial determination of probable cause as a prerequisite to detention")); *see also State v. Huddleston*, 924 S.W.2d 666, 672 n.2 (Tenn. 1996). Tennessee Rule of Criminal Procedure 5(a)(1) provides that "[a]ny person arrested - except upon a capias pursuant to an indictment or presentment - shall

be taken without unnecessary delay before the nearest appropriate magistrate." The Tennessee Supreme Court has recently stated that "a delay of less than forty-eight hours is presumptively reasonable" and that when the delay exceeds forty-eight hours, the State must show that "'a bona fide emergency or other extraordinary circumstance' caused the delay." *Bishop*, 431 S.W.3d at 42 (quoting *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991)). Nonetheless, even a delay of less than forty-eight hours may be *unreasonable* "if the delay is 'for the purpose of gathering additional evidence to justify the arrest' or if the delay is 'motivated by ill will against the arrested individual, or delay for delay's sake.'" *Id.* (quoting *McLaughlin*, 500 U.S. at 56). "Courts cannot ignore the often unavoidable delays in transporting arrested persons from one facility to another, handling late-night bookings where no magistrate is readily available, obtaining the presence of an arresting officer who may be busy processing other suspects or securing the premises of an arrest, and other practical realities." *McLaughlin*, 500 U.S. at 56-57.

The remedy for failing to bring an arrestee before a magistrate without unnecessary delay is exclusion of "any evidence obtained by virtue of a suspect's unlawful detention," unless an exception to the exclusionary rule applies. *Id*. (citing *Huddleston*, 924 S.W.2d at 673-75). However, "when a suspect is arrested based on probable cause, the ensuing detention is typically not illegal until it 'ripens' into a *Gerstein* violation." *Id*. (citing *Huddleston*, 924 S.W.2d at 675). "Obviously, if [an arrestee's] statement was given prior to the time the detention ripened into a constitutional violation, it is not the product of the illegality and should not be suppressed." *Huddleston*, 924 S.W.2d at 675.

The first question we must address is whether the police had probable cause to arrest the Defendant at the time of his arrest. "Probable cause . . . exists if, at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are 'sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense.'" *Echols*, 382 S.W.3d 266, 277-78 (Tenn. 2012) (quoting *State v. Bridges*, 963 S.W.2d 487, 491 (Tenn. 1997)); *see Beck v. Ohio*, 379 U.S. 89, 91(1964). "'Probable cause must be more than a mere suspicion.'" *Echols*, 382 S.W.3d at 278 (quoting *State v. Lawrence*, 154 S.W.3d 71, 76 (Tenn. 2005)). However, probable cause "'deal[s] with probabilities[,] . . . not technical[ities,] . . . the factual and practical considerations of everyday life on which reasonable and prudent [persons] . . . act.'" *Id*. (quoting *State v. Day*, 263 S.W.3d 891, 902 (Tenn. 2008)); *see Brinegar v. United States*, 338 U.S. 160, 175 (1949). Moreover, a determination of probable cause encompasses the accumulation of information known to law enforcement collectively if a sufficient nexus of communication exists between the arresting officer and a fellow officer with pertinent knowledge. *Echols*, 382 S.W.3d at 278 (citation omitted).

When determining whether the police possessed probable cause, "the courts should consider the collective knowledge that law enforcement possessed at the time of the arrest, provided that a sufficient nexus of communication existed between the arresting officer and any other officer or officers who possessed relevant information." *Bishop*, 431 S.W.3d at 36. Such a nexus exists when the officers are relaying information or when one officer directs another officer to act. *Id.* It matters not whether the arresting officers themselves believed that probable cause existed. *Id.* (citing *Huddleston*, 924 S.W.2d 666, 676 ("[An officer's] subjective belief that he did not have enough evidence to obtain a warrant is irrelevant to whether or not probable cause actually existed.")). When determining the existence of probable cause, the courts should also consider the entire record, including the proof adduced at both the suppression hearing and the trial. *Id.* at 36-37 (citing *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998)).

In this case, the Defendant never specifically asserted to the trial court that the police did not have probable cause to arrest him. Accordingly, much of the evidence needed to determine whether the police had probable cause to arrest the Defendant must be pieced together from the record. During the motion to suppress hearing, the trial, and during the motion for new trial hearing, evidence was presented about what police knew at the time of the Defendant's arrest. The police knew that the murder in this case occurred on March 10, 1997. Police began an investigation of the homicide, and the Defendant was identified as a "suspect." Sergeant A.J. Christian testified during the motion to suppress hearing that the police had spoken with witnesses "[t]hat actually saw the shooting." Charles Milem, the victim's uncle, gave police officers a statement the night of the shooting. He and other witnesses at the scene told officers that they had seen a "white box-type Chevy headed" away from the scene. One of the State's key witnesses, Lakendra Mull, whose testimony is summarized above, testified at trial that she found out about the shooting when she returned home after dropping the victim off the night he was shot. She said that she spoke with police and gave them a statement the day after this incident. This statement implicated the Defendant as a suspect in this shooting. It appears from the record that the police had spoken with Ms. Mull before they arrested the Defendant at some point in the "evening" shortly before 8:45 p.m. Ms. Mull's statement provided the police with the Defendant's motive for the shooting and his opportunity. Her statement also indicated that the Defendant carried and possessed a weapon. This statement gave the officers sufficient probable cause for the Defendant's arrest.

The Defendant points out that, at one point during Captain Logan's testimony, he stated that he did not have "enough to charge" the Defendant at the time of his arrest. Later during that same testimony, however, Captain Logan was asked whether he was testifying that the police did not have probable cause to charge the Defendant upon his initial arrest, and the Captain answered in the negative. Regardless, "[i]t matters not whether the arresting

officers themselves believed that probable cause existed." *Bishop*, 431 S.W.3d at 36. We conclude that the record evinces that the police did, in fact, have probable cause to arrest the Defendant after receiving Lakendra Mull's staement on the evening of March 11, 1997.

"[W]hen a suspect is arrested based on probable cause, the ensuing detention is typically not illegal until it 'ripens' into a *Gerstein* violation." *McLaughlin*, 500 U.S. at 56-57. (citing *Huddleston*, 924 S.W.2d at 675). "Obviously, if [an arrestee's] statement was given prior to the time the detention ripened into a constitutional violation, it is not the product of the illegality and should not be suppressed." *Huddleston*, 924 S.W.2d at 675. The question we must now address is whether the record proves that the Defendant was in custody for more than forty-eight hours before he gave his statement, so as to prove that the his detention breached a clear and unequivocal rule of law.

At the hearing on the motion to suppress the Defendant's statement, the evidence revealed that the Defendant was taken into police custody for questioning without a warrant on the evening of March 11, 1997. Officers transported the Defendant to the Memphis Police Department Homicide Office for a formal interview. There, he was advised of his rights. According to officers, the Defendant refused to sign a waiver of rights form, but agreed to talk to the officers. At the time, the Defendant denied any involvement in the death of the victim. At 8:20 p.m. on March 11, 1997, the Defendant was allowed to telephone his mother. Officers then booked the Defendant into jail. The Defendant's "arrest ticket" indicated that the Defendant was arrested at 8:45 p.m. on March 11, 1997.[2]

The evidence of the times of the Defendant's arrest and his first statement are ambiguous at best. The Defendant's mother indicated the police left her home around 5:45 p.m. on March 11, 1997. The Defendant admitted that he was not in custody at 4:05 p.m. on March 11, 1997, and also that he agreed to talk with police around 4:05 p.m. on March 13, 1997. An officer who participated in questioning the Defendant testified that on March 13, 1997, the Defendant signed a waiver of rights form at 4:05 p.m. The Defendant then told officers that he did not wish to make a statement until he spoke to his mother. Both Sergeant McCommon and the Defendant testified that the Defendant orally confessed to this killing *before* he spoke with his mother but after he signed the waiver of rights form. The Defendant then spoke with his mother at 6:52 p.m. This means that his first confession occurred between 4:05 p.m. and 6:52 p.m. on March 18, 1997. At 7:20 p.m., the Defendant made another statement to the officers, in which he confessed to shooting the victim. At 8:20 p.m., the Defendant signed the typewritten statement that he made to police. The officers then

---

[2] Although Sergeant A. J. Christian discussed an "arrest ticket" during his testimony at the hearing on the motion to suppress, we find nothing in the record concerning the admission into evidence of such an item or a copy thereof.

allowed the Defendant to make another phone call at 8:23 p.m. According to one officer, during the Defendant's interview on March 13, the officers fed him a meal.

While not totally clear, it appears that the Defendant made his first confession before being in custody for more than forty-eight hours. It also appears that part of the delay in the forty-eight hour time frame was caused by the Defendant's desire to speak with his mother. Because of the ambiguity and because some of the delay is attributable to the Defendant, we conclude that the Defendant's detention did not breach a clear and unequivocal rule of law. The Defendant is not entitled to plain error review on this basis.

### C. Substantial Justice

Because we have concluded that the Defendant's detention did not breach a clear and unequivocal rule of law, we need not go further in our analysis. The Tennessee Supreme Court, however, recently addressed an issue similar to the one currently before us in *State v. Bishop*, 431 S.W.3d 22 (Tenn. 2014). In that case, the Court concluded:

> Mr. Bishop was arrested with probable cause. He subsequently confessed three times to shooting Maurice Taylor. On one of those occasions he was testifying under oath before a jury. Under these circumstances, it is difficult to perceive how substantial justice requires the reversal of his conviction for first-degree felony murder in perpetration of an attempted aggravated robbery.

*Id.* at *45.

We reach a similar conclusion in this case. There were witnesses to the events before and during the shooting that showed that the Defendant was jealous of the victim's relationship with the Defendant's girlfriend. The Defendant followed the victim to the victim's home on the night of the shooting, believing that the Defendant's girlfriend was in the car with the victim and the Defendant's roommate. Shell casings were found at the scene of the crime near the body. The Defendant told officers where they could find the gun that he had used in the murder. Police retrieved the weapon and submitted the 9mm pistol found, seven live cartridges, one bullet, one bullet core fragment, and three fired cartridge casings to the Tennessee Bureau of Investigation Crime Laboratory. Testing showed that all three of the fired cartridge cases had been fired through the submitted pistol. The bullet fragment had also been fired through the barrel of the pistol. The Defendant confessed to police that he had committed this murder, and he testified at trial that he had shot the victim but attempted to explain that he had done so in self-defense. Under these circumstances, it is

-24-

difficult to perceive how substantial justice requires the reversal of his conviction for second degree murder.

Accordingly, we affirm the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE